73 N.J. Super. 493 (1962)
180 A.2d 329
C.J. KYLIE MYERS, PLAINTIFF-RESPONDENT,
v.
ARCADIO, INC., A CORPORATION OF NEW JERSEY, AND NICHOLAS ROSELLI, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 12, 1962.
Decided March 23, 1962.
*494 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Benedict W. Harrington argued the cause for appellants (Messrs. Kessler, Kessler & Harrington, attorneys).
Mr. Harold Gurevitz argued the cause for respondent (Mr. Serge P. Pizzi, attorney).
The opinion of the court was delivered by GAULKIN, J.A.D.
Plaintiff, a real estate broker, sued defendants, purchasers of property shown to them by plaintiff. The pretrial order described the action as one "based on the unlawful and tortious interference with the plaintiff's business as a real estate broker." The jury awarded plaintiff $2,820 (6% of the $47,000 sale price), and defendants appeal from the resulting judgment.
From the evidence, although disputed, the jury had the right to find the following to be the facts:
*495 Defendant Nicholas Roselli asked plaintiff's employee Underhill to find land suitable for an automobile showroom for Arcadio, Inc., a Roselli family corporation. Underhill showed Roselli four properties currently listed with plaintiff, none of which suited Roselli. Plaintiff then gave Underhill more listings to show to defendants, among them a property owned by Serge Pizzi and another the property in question, owned by the "Estate of Alice Cronshey." The Cronshey property had been "multiple listed" in October 1956 with the Morris County Board of Realtors through another broker, and the listing had "expired" on April 19, 1957.
On July 16, 1959 Underhill showed Roselli the Pizzi property, but it was too small. He then showed him the Cronshey property on the other side of the street. There was a sign on a tree stating that the property was for sale and inviting the public to contact Charles Cronshey at a given telephone number, or to "consult your own broker." No one was about. The old house on the property was vacant, and Underhill and Roselli made no attempt to enter it. After looking over the land, Roselli said he was interested and asked Underhill to find out the price and other pertinent details.
That day or the next Underhill telephoned Mr. Cronshey, but he was out. He spoke to Mrs. Cronshey and made an appointment to see Mr. Cronshey the following evening, but could not keep it. On July 19 he spoke to Mr. Cronshey on the telephone. Cronshey told Underhill the property was still for sale at $55,000, and that a commission of 6% would be paid. Underhill told Cronshey he had a prospect, but he did not tell him who it was.
On July 20 Underhill told Roselli "that the property was being offered at $55,000, that the property was available for sale. I gave him the dimensions of the property. Information that it was in a business zone and that a showroom would be allowed at this property." Underhill asked Roselli for an offer, and Roselli answered "that he would *496 have to get an offer from his father and his father would have to look it over, because he was the one that had the money and he would ultimately decide on what property they would buy." A day or two later Underhill asked Roselli if his father had looked at the property, and Roselli said he had not. Roselli, said Underhill, "put me off."
About a week later, or early in August, Underhill again asked Roselli for an offer. This time Roselli answered "he didn't think that his father would be interested in that and just to drop it." On August 12 Underhill told Roselli "I thought he should make an offer on this property. That I had a feeling that someone else would pick it up * * *" and Roselli answered "Forget about the whole thing. We are not at all interested in it."
During this period Underhill had made two more appointments to meet Mr. Cronshey but did not keep them, apparently because of other more promising engagements, since he had no offer from defendants or even an indication that they were really interested in the property. However, during all this time defendants had been secretly negotiating directly with Mr. Cronshey for the purchase of the property through one Goodman, a broker friend of defendants. Cronshey did not know defendants had been shown the property by Underhill. Indeed, Cronshey apparently did not know he was selling to defendants, for the contract finally signed named Goodman and his wife as the buyers.
The Cronshey-Goodman contract was signed August 20. The price was $47,000, the seller to pay no commission. The contract was thereafter assigned to the corporate defendant and title closed September 23. Defendants claim they paid Goodman $3,000 commission for his services. It was not until March 1960 that plaintiff learned that Arcadio had purchased the property. Plaintiff first demanded a commission from the seller, but when he found that Mr. Cronshey did not know that plaintiff had shown the property *497 to defendants, and learned the facts about defendants' activities, this suit was started.
Defendants moved to dismiss at the end of the plaintiff's case, and for judgment at the end of the entire case, principally upon the ground that the owner had not authorized plaintiff to look for a buyer when plaintiff's salesman Underhill showed the property to Roselli. However, plaintiff did have a listing, albeit old and "expired" in the sense that the special rights given by the owner to participating brokers under a multiple listing agreement had ended. In addition, although the sign on the property was addressed to the world at large, it indicated that the property was still for sale and the continued willingness of the owner to deal with brokers. In this appeal defendants (through new counsel) shift their ground somewhat from the position taken by trial counsel. Here defendants admit, as they must, that the existence of an agreement for commission with the owner is not essential for the maintenance of an action such as this. What defendants now say, to quote their brief, is that the broker may recover when an owner "with whom he has a contract is prevailed upon to breach the contract, or where the plaintiff is about to enter into a contract and is prevented from so contracting by the unlawful and malicious interference of the defendant." (Emphasis ours)
We think the underlined words overstate what the broker is obliged to prove. We hold that the rule to be applied in a case such as the one at bar is that the broker may recover when the jury is satisfied that but for the wrongful acts of the defendant it is reasonably probable that the plaintiff would have effected the sale of the property and received a commission. Brenner & Co. v. Perl, 72 N.J. Super. 160 (App. Div. 1962); Sustick v. Slatina, 48 N.J. Super. 134 (App. Div. 1957); George H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159 (App. Div. 1957); McCue v. Deppert, 21 N.J. Super. 591 (App. Div. 1952). See also Louis Schlesinger Co. v. *498 Rice, 4 N.J. 169, 180 (1950). 1 Harper and James, Torts, 1956, § 612, p. 514 says:
"Any intentional interference with negotiations reasonably certain to result in an advantageous contract on the part of the plaintiff is, unless privileged, an actionable wrong."
At the trial the defendants asked for and the judge gave the following instruction to the jury:
"The mere proof of competition or interference is insufficient to give rise to the relief here demanded. There must be proof that the interference resulted in damage to the Plaintiff. This means only that if the acts of the Defendant had not been done, there is a reasonable certainty that the agreement alleged by Plaintiff would have been performed."
We quote this instruction not as a model but to show that the real issue tried below and involved in this appeal is not the rule but whether the facts here established a cause of action within it. Indeed, the charge should have used the expression "reasonable probability" rather than "reasonable certainty," to comport with our law. Botta v. Brunner, 26 N.J. 82, 90 (1958); Budden v. Goldstein, 43 N.J. Super. 340, 347 (App. Div. 1957).
Defendants' argument is that merely being in the business does not entitle a real estate broker to damages from the buyer whenever a person to whom he shows a house buys it directly from the owner and the owner refuses to pay a commission. For example, if a person sees a photograph of a house in a broker's office and, recognizing it, goes directly to the owner and buys it, even at the price at which it is listed with the broker, the broker may not recover damages from the buyer. Similarly, defendants say that if a broker, en route to show a prospective buyer a property, remarks that the house they just passed is for sale, the customer may buy directly from the owner with impunity. In short, say defendants, if the broker has no agreement with the owner and relies on negotiations reasonably *499 probable to result in an advantageous contract as a substitute, the broker must first show sufficient substantial steps taken by him with reference to the property and in the direction of the owner to deserve being called "negotiations" before the court even reaches the question whether the jury is to be permitted to decide whether it was reasonably probable that the negotiations would have resulted in an advantageous contract. Cf. Goldman v. Feinberg, 130 Conn. 671, 37 A.2d 355 (Sup. Ct. Err. 1944); Flaster v. Lincoln Tidewater Terminals, 124 N.J.L. 69, 71 (E. & A. 1940); McCue v. Deppert, supra, 21 N.J. Super., at p. 598. Defendants contend, in the case at bar, that plaintiff did not do enough to constitute "negotiations" with the owner within the meaning of the stated rule before defendants themselves contacted the owner; they were under no obligation to tell plaintiff of their negotiations with the owner; whatever plaintiff did after defendants contacted the owner was immaterial, especially since plaintiff dealt only with defendant Roselli, took no steps whatever toward the owner, and made no effort to obtain a commission contract from him. Defendants argue that the property was not listed with plaintiff or with any broker but was offered to the world at large by the sign on the tree; and that Roselli saw the sign at the same time Underhill did. Defendants conclude that under all of the foregoing circumstances they had the right, i.e., it was not wrongful, for them to go to Cronshey directly.
Furthermore, say defendants, if we should hold that plaintiff's acts did attain the dignity of "negotiations" within the meaning of the rule, they were so trifling and remote that they could not have resulted, with reasonable probability, in a commission contract with the owner, and hence either the motion for dismissal or for judgment should have been granted.
His knowledge of available properties is the broker's chief stock in trade. Development of interest in those properties by exhibiting them to potential buyers is his *500 chief activity, and he does that frequently with nothing more than the expectation that if he produces a buyer the owner will pay him a commission. That expectation may arise from an express agreement with the seller (even though unenforceable, because oral or for other reasons), but it may also arise out of other circumstances, such as an offer to the public or to brokers generally; and generally owners fulfill such expectations. It is actionable to rob the broker of the product of his stock and his industry when, but for the wrong of the buyer, it is reasonably probable that the owner would have paid the broker for it.
In Sustick v. Slatina, supra, we pointed out that in this field of the law, as in so many others, it is impossible to lay down precise rules of liability which will readily solve all cases. Each case in this field must be decided upon its own facts and that is how we shall decide this one, tempting though it is to enter upon a discussion of the general arguments (some with considerable merit) advanced by defendants.
As we said in Sustick, supra, 48 N.J. Super., at p. 144:
"The essence of the cases in this field is that in adjudging whether what the defendant has done is actionable, i.e., not done in the exercise of an equal or superior right, the ultimate inquiry is whether the conduct was `both injurious and transgressive of generally accepted standards of common morality or of law' * * * In other words, was the interference by defendant `sanctioned by the "rules of the game."' * * * There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not only must defendants' motive and purpose be proper but so also must be the means."
Cf. Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 255 (App. Div. 1957).
In the case at bar the defendants had requested Underhill to find them a property; the plaintiff had the listing of the Cronshey property; that listing led him to show the property to Roselli; Roselli expressed an interest *501 and instructed Underhill to obtain a price and details. The sign on the property and the subsequent telephone call confirmed the fact that the property was still for sale at the listing price of $55,000 and that a commission of 6% would be paid; Underhill obtained the information requested by Roselli, submitted it to him, and solicited a counteroffer. We hold that (especially since defendant's deceit lulled plaintiff into doing no more) these steps were sufficient to constitute "negotiations" within the meaning of the rule, and that there was ample evidence to justify the conclusion that had defendants not gone directly to the owner it was reasonably probable that plaintiff would have made a deal with the owner which would have cost the defendants no more than the total of $50,000 they say they paid for the property, and plaintiff would have received the commission. We do not need to decide whether defendants would have been liable if Roselli had told Underhill, when he saw the sign, that he proposed to deal with the owner himself. At least that would have given plaintiff a sporting chance to persuade the owner to recognize him as the broker, or perchance to produce another buyer. Instead Roselli lulled plaintiff into doing nothing while defendants bought the property through Goodman. That the owner was anxious to sell and the defendants avid to buy is clear from the facts, and there is nothing to indicate that anything was contributed to the transaction by Goodman that would not have been accomplished with ease by plaintiff. Upon the sum total of these facts, and applying the rules quoted in Sustick, supra, we hold that the judgment should be affirmed, with costs.