### W. M. BOYLES and Ernestine Hyder, Appellants,

v.

### Thomas D. THOMPSON, Appellee.

### No. 18113.

Court of Civil Appeals of Texas, Fort Worth.

July 5, 1979.

824

Jearl D. Walker, Fort Worth, for appellants.

Meier & Keller and Wallace T. Keller, Euless, for appellee.

## OPINION

MASSEY, Chief Justice.

Thomas D. Thompson, plaintiff, sued W. M. Boyles and Ernestine Hyder, defendants, seeking to collect damages, either as money due and owing by contract for real estate broker's commission or as damages for breach of contract and because of action of the defendants, as conspirators, which sought to deprive him of payment of the commission. As against Boyles there was also charged that he had tortiously interfered with Thompson's contractual rights with Hyder.

Trial was to a jury, upon the verdict of which, coupled with findings by the court under the provisions of Tex.R.Civ.P. 279, "Submission of Issues" as necessary to sustain ground of recovery, a judgment was rendered for Thompson. Boyles and Hyder appealed.

We affirm.

The important issues and answers of the verdict were:

"SPECIAL ISSUE NO. 1.

"Do you find from a preponderance of the evidence that there was a conspiracy between Mrs. Hyder and Mr. Boyles to deprive Mr. Thompson of a real estate commission?

"You are instructed that a conspiracy consists of a combination of two or more persons to do that which is contrary to law or to do that which is wrongful and harmful toward another person or to carry out an object not in itself unlawful by unlawful means.

"     .     .     .

"Answer: *There was a conspiracy.*

"SPECIAL ISSUE NO. 2.

"Do you find from a preponderance of the evidence that Mr. Boyles interfered with the right of Mr. Thompson to a real estate commission under the contracts in question?

"You are instructed that 'interfered,' as used in the above special issue means intentional and willful acts calculated to cause damage to one engaged in his lawful business and done with the unlawful purpose of causing damage or loss, without right of justifiable cause on the part of the one interfering, and where actual damage and loss resulted.

"     .     .     .

"Answer: *He did interfere.*"

(By answer to Special Issue No. 3 the jury found Thompson's efforts in behalf of Hyder was the procuring cause of the sale made by Hyder to Boyles.)

(By answer to Special Issues Nos. 4 and 5 the jury denied Thompson any exemplary damages.)

(By answer to Special Issue No. 6 the jury found amounts as reasonable attorneys fees for Thompson in trial and appellate courts.)

"SPECIAL ISSUE NO. 7.

"Do you find from a preponderance of the evidence that Mr. Thompson, Mrs. Hyder, and Mr. Boyles entered into an accord and satisfaction of their rights under the contracts in question?

"You are instructed that an accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept, in satisfaction of a claim

arising from the contracts, something other than or different from what the claimant is, or considers himself, entitled to. A satisfaction is the execution or performance of such an agreement.

"    .    .

"Answer: *There was not an accord and satisfaction.*"

Thompson, a real estate broker, was a long time acquaintance of Hyder. He had acted as her real estate broker in transactions previous to that with which we are presently concerned. The particular properties with which the instant transaction was concerned were not "listed" with Thompson as is common in instances where a broker seeks a purchaser of his client's properties and, if one found, participates in execution of contract of purchase and sale. Here there was nothing in writing until Thompson had successfully located the promised purchaser Boyles. Evidence of the fact of contract(s) consisted of the contract the written form executed by Boyles with Hyder, Hyder with Boyles, Thompson with Hyder and Hyder with Thompson on September 13, 1975. Actually there were three separate contracts, all identical in material aspect, upon Tracts 1, 2, and 3 and the total of the consideration to be paid by Boyles was $275,000.00 and the total of the "liquidated damages", $2,500.00, of which— if Boyles breached his contract was provided to be divided by Hyder and Thompson on a 50–50 basis.

We copy in material aspect the contract relative to Tract 1.

"THE STATE OF TEXAS

"COUNTY OF TARRANT

"ERNESTINE W. HYDER, Executrix of the Estate of Elton M. Hyder, Deceased acting through the undersigned and duly authorized Agent, hereby sells and agrees to convey unto W. M. BOYLES or Assigns, hereinafter called Purchaser, the following described property:

(here follows legal description of realty)

the purchase price is $55,000.00, payable as follows:

"$55,000.00 Cash (of which Purchaser has deposited with the undersigned Title Co.

"$500.00 as part payment,    .    .    .)

"Seller agrees to furnish Warranty Deed & Title Policy to said property, which shall be conveyed free and clear of any and all encumbrances except those named herein.

"    .    .

"If title policy is furnished, Purchaser agrees to consummate the sale within ten days from date title company approves title.

"    .    .

"Seller agrees when the title objections have been cured, to deliver a good and sufficient General Warranty Deed properly conveying said property to said Purchaser, and Purchaser agrees, when said deed is presented, to pay the balance of the cash payment and execute the note and Deed of Trust herein provided for. Should the Purchaser fail to consummate this contract as specified for any reason, except title defects, Seller shall have the right to retain such cash deposits as liquidated damages for the breach of this contract, and shall pay to Agent therefrom the sum of $250.00.

"    .    .

"Seller agrees to pay the undersigned duly authorized agent a commission of 6% in cash for negotiating this sale.

"    .    .

"Executed in triplicate this 13th day of September 1975."

It is to be understood that Thompson never had a contract with Boyles, it was Hyder who had a contract with Boyles. Simultaneous with the execution of the contract of Boyles with Hyder, and by the same instrument, was provided written evidence of the contract between Hyder and Thompson. Their contract read as follows:

"Seller (here Hyder) agrees to pay the undersigned duly authorized agent a commission of 6% in cash for negotiating the sale."

Noticed on the contract(s) is that by the agreement of the essential parties a usual

clause common to such contracts was deleted. Such clause read as follows: "[O]r Seller may enforce specific performance of this contract."

By October 8, 1975, for reasons not necessary to be detailed, Boyles had developed pronounced animosity to Thompson.

Prior to October 8, 1975, the title company had approved all titles. By authority of contractual provisions Thompson, acting for principal Hyder as agent and by her instruction, served letter notice on a Mr. Campbell, attorney for Boyles, on October 10, 1975, demanding "closing" on or before October 18th or forfeiture of the total deposit of $2,500.00 as liquidated damages (on Tract 1 contract $500.00; on Tract 2 contract $1,000.00; and on Tract 3 contract $1,000.00). The text of the letter follows:

"This letter is to inform you that my client, Mrs. Ernestine Hyder, is demanding that your client, Mr. W. M. Boyles, proceed to close the sale made on September 13, 1975. You have the signed contracts, an escrow check for $2,500.00, and title brought to date as of October 8, 1975 in your possession.

"We are insisting that these contracts be closed as agreed by the Seller and Purchaser. In the event that your client is unwilling or unable to close by October 18th, 1975, we are requesting the forfeiture of the earnest money held by you as per the contract.

"Sincerely yours,

"/s/ Thomas D. Thompson

"Agent for Seller."

Boyles refused to complete the transaction and agreed to the forfeiture of his $2,500.00 as "liquidated damages" (we need not engage the question of whether said amount was truly liquidated damages or was a mere penalty). Rattikin Title Company, for whom Campbell was also the agent and attorney, was holding the $2,500.00 in escrow pending "closing". There is no question but that it was with the consent of Hyder and Boyles that the

two checks issued by Rattikin Title Company on October 20, 1975, ($1,250.00 to Hyder and $1,250.00 to Thompson) was accepted by Hyder as the amount agreed in the event Boyles breached the September 13, 1975, contract(s) to purchase Hyder's properties. Thompson accepted the $1,250.00, as his entitlement from Hyder in the event Boyles breached his contract to purchase.

All that is written above is established by the record. In view of the fact that immediately subsequent to October 20, 1975, indeed on October 21st, Boyles and Hyder did proceed to agree to a transaction of sale and purchase of the same properties, at the same (questionable but so contended by Hyder and Boyles) price of $275,000.00, issues arose upon which Thompson declared by his suit. This transaction was consummated as "closed". There was no direct proof that there was any communication, and thus no direct proof of agreement, between Hyder and Boyles antecedent to October 21, 1975. However, by inferences Thompson believes proper to be drawn from the proven actions of Hyder and Boyles on such date and thereafter, there had occurred one or more occasions of communication between these parties prior to Boyles' consent to forfeit his $2,500.00. Furthermore, Thompson believes that thereat was interference by Boyles with his contract with Hyder, an agreement and accord by Hyder to such interference, plus her concurrence with Boyles' desires and agreement upon the action actually taken to carry out his objective. Thompson believes that such objective was that there would be permitted the ficticious termination of the contract of September 13, 1975, to be followed by a re-entry into contract by Hyder and Boyles whereby the former would sell and the latter would purchase the identical properties at the same or a lower price under circumstances by which Thompson would have no right to receive any commission.

In view of the foregoing the area of dispute is narrowed. The issues relate to whether, the sale made by Hyder to Boyles

after October 20, 1975, was one as to which Thompson's services was the procuring cause;—as related to the transaction of what Hyder and Boyles considered the concluded contract of September 13, 1975 (because it was not consummated by October 18, 1975) whether there was express or tacit agreement by Hyder to a course of action suggested by Boyles, or insisted upon by Boyles, as a condition for his subsequent purchase of Hyder's properties. Such course of action would be for Hyder and Boyles to handle matters so as to accomplish what they hoped or believed would conclude all rights of Thompson under the September contract.

Established, as it was admitted by Hyder and Boyles, was that their "new deal" of October 21, 1975, whereby Hyder agreed to sell and Boyles to purchase the identical properties upon an all cash consideration at the identical price of $275,000.00. (To pay all cash was slightly more onerous to and less favorable to the interest of Boyles than the original agreement in September under which he was to assume certain indebtedness of Hyder secured by liens upon the Hyder properties.) This agreement of October 21st was reduced to writing on October 22nd, 1975, and consummated in November of 1975.

Not a party to the suit below was attorney Campbell. "He wore several hats." Before and incident to the September 13, 1975, contract he was Boyles' attorney;—on and after that date he was the Rattikin Title Company attorney as well, such title company having been agreed upon by the parties at Boyles' insistence, and it was the same title company and attorney who arranged and concluded the ultimate sale made from Hyder to Boyles;—and after the Boyles breach of the September contract on either October 18th or 20th, 1975, Campbell was engaged as Hyder's attorney to use some of the $20,000.00 loaned by Boyles to Hyder on October 21, 1975, to settle some indebtedness upon which her property stood as security in order to forestall threatened foreclosure proceedings.

Pursuant to the closing of the Hyder-Boyles transaction(s) in November of 1975, Rattikin Title Company, with Campbell its attorney, withheld from Hyder the sum of $16,500.00 as the Thompson broker's fee entitlement, and it continued to withhold it from her for several months. Ultimate delivery thereof made to Hyder was not explained.

Before the October 21, 1975, Hyder-Boyles transaction was "closed" information came to the attention of Thompson which caused him to suspect that their transaction either pended or had been concluded. He telephoned Hyder. Hyder admitted to him that she had agreed with Boyles upon the October 21, 1975, transaction, but that it was not yet concluded. She furthermore admitted that the fact that she and Boyles had made the "new" agreement was supposed to be kept secret from Thompson and that she feared that if Boyles learned that Thompson had received her admission, or knew about the transaction, he (Boyles) might not go through with his agreement to purchase.

Reverting to the time when Hyder, as principal, directed Thompson, as agent, to write the October 10, 1975, letter demand upon Boyles to "close" the September contract: on this there is evidence that by that time there was conversation between Hyder and Thompson relative to alleviation of the Hyder need to have Boyles proceed to a "closing". Both Hyder and Thompson agree that there was the conversation, but some disagreement concerning its date and what was said. According to Thompson, Hyder advised that she had been bailed out of her financial difficulties by her sister and brother-in-law who lived in Dallas; that they had agreed to purchase the properties for $250,000.00, with part of it advanced to take care of her money problems necessary to forestall the foreclosure proceedings (which had seemed imminent) so that her dire need to have Boyles "close" had ceased to exist. Of course, Hyder stood committed to consummate the transaction of sale to

Boyles, at least until October 18th. Thompson's obvious interest was served only if the sale to Hyder's sister and brother-in-law was forestalled, with the sale to Boyles consummated. Only if there was completion of the sale to Boyles would he be entitled to a $16,500.00 commission as broker. If there be not such consummation, on account of Boyles' breach of contract, all he would receive would be $1,250.00 agreed to be paid to him by Hyder. (We forego discussion on the different question of the Thompson entitlement if the contract failed of consummation because of breach on the part of Hyder.)

The Hyder testimony about what she told Thompson was different. According to Hyder her only communication had been with her sister pursuant to a telephone call on October 20, 1975, the same day she received Boyles' "forfeit money", that there was never any agreement to sell involved. What Hyder received was a promise that she could have a loan from her brother-in-law and sister sufficient to forestall any foreclosure on her property. The sister and brother-in-law were never identified. Neither was tendered as a witness.

As hereinabove noticed, it was the day following October 21st that Hyder telephoned Boyles and then went to his office and made her "new" deal. At the same session at which she concedes she made the "new" contract to sell to Boyles she received $20,000.00 from him as a loan.

On the occasion for her communication with Boyles on October 21st Hyder testified that it was because she had received a call from a Bobby Malone the same day and that Malone expressed a desire to buy one of the three tracts she wished to sell. She conceived the idea to call Boyles because of Malone's interest. She stated she called him with the thought that since Malone was interested in one of the tracts perhaps Boyles might be interested in buying the same three properties on their contract of September 13, 1975, because he would be able to sell one of them to Malone or in any event might wish to make the attempt. On the occasion of that call Boyles stated his willingness to make the same purchase previously contemplated if he could make an entirely "new" deal wherein Thompson would have no interest and would not be involved. Hyder was agreeable, especially if in so doing she could preserve the properties against foreclosure proceedings. It is obvious that she did not then have possession of any money of her sister and brother-in-law. Boyles agreed to supply her with money for this purpose. His $20,000.00 loan to her was secured by a lien on Tract 1 of Hyder's property.

Upon receipt of the $20,000.00 Hyder employed the services of Campbell as her own attorney, to use to forestall the hazards of foreclosure proceedings. Campbell did efficiently serve Hyder as his client, and did promptly attend to her business so that the mortgage holders were satisfied.

Relative to occurrences on and after October 21, 1975, Boyles'. testimony was in accord with that of Hyder. He also testified that the animosity he had felt toward Thompson was sufficient for him as a reason to refuse to go forward with the initial transaction even before October 18, 1975. He wanted nothing to do with Thompson any longer nor with any transaction in which Thompson might have an interest. He was, of course, aware, and did agree, that by his breach of contract Thompson would receive 50% of the $2,500.00 advanced as his earnest money on the September contract. If believed, Boyles was willing to pay for (or lose) $2,500.00 if he could see that Thompson should profit only by 50% thereof, or $1,250.00, and not by his commission from Hyder of $16,500.00. Nothing was clarified relative to Hyder's $1,250.00 profit, so it might be assumed that for her to receive it was benefit conferred with Boyles' blessing.

As it in fact developed, Boyles did not suffer loss of the $2,500.00. In the "new" contract of October 22, 1975, was recited that $2,500.00 was advanced by him to Hy-

der to be applied upon the $275,000.00 purchase price Hyder should receive "on closing". From the evidence it was obvious that no new $2,500.00 was actually advanced by Boyles; furthermore obvious is that in the consummation of the "new" Hyder-Boyles transaction at the "closing" in November, 1975, Boyles received credit, nevertheless, as though such $2,500.00 sum had been so advanced.

Boyles further testified that there had been no communication with Hyder antecedent to October 21, 1975, when she telephoned him; that pursuant to his conversation with her on that date he decided anew to make the purchase from Hyder at the same price; that he agreed to do so upon being assured by Hyder that Thompson would not be associated with the sale and purchase in any way. In other words, according to Boyles (by necessary inference) he was assured that Hyder would not owe or pay Thompson any part of the consideration she should receive from Boyles. Boyles did not deny that he told Hyder that she should not communicate to Thompson any information of their "new" transaction, but should keep it secret from him. As Hyder expressed her statement to Thompson prior to the time Boyles gave his evidence, was "I am not supposed to talk about it."

■ (The jury found that Thompson's services to Hyder was the procuring cause of the sale finally made to Boyles. Thus Hyder's liability to Thompson is to be affirmed under the law of contracts. Our discussion to follow will deal primarily with her liability by the law of torts and of her breach as a tort.)

There was other evidence not described hereinabove, but we deem that stated sufficient to create the legal presumption which, if not satisfactorily explained so as to make necessary the submission of a fact issue upon Hyder's liability in tort, would entitle Thompson to a judgment against her for a 6% commission (or for damages which would be equivalent to a computed 6% commission on the $275,000.00 for which the property was sold). The measure of damages applicable by the circumstances would be identical either by tort law or by contract law. In other words, if Hyder is not excused by explanations which if believed would show that Thompson was for some reason estopped to claim his entitlement by contract, or for some other reason should not have that to which the law would presume him to be entitled by reason of his performance, there would be exhibited Thompson's entitlement to judgment against her. Hyder's evidence did not make the explanation which in law would make an issue for the jury on justification of Hyder to deny Thompson his commission.

On the foregoing see the following: Restatement of the Law, *Restitution* Ch. 7 (at 522) on "Benefits Tortiously Acquired" (1937); Restatement of the Law, *Contracts* § 295 (at 438), "Excuse of Condition by Prevention or Hindrance, § 303 (at 448), "Excuse or Condition . . .", and § 310 (at 459), "Re-Creation of Duty Otherwise Than by Performance or Acceptance of Performance" (1932); 17A Words & Phrases on "Fraud" at 63, "Gain to Wrongdoer" and at 135, "Trick or artifice" (1958); 5 Words & Phrases on "Bad Faith" at 15, "In general", and at 21 "Fraud synonymous" (1968); 37 C.J.S. Fraud § 115 at 436, "—Circumstantial Evidence" (1943); Restatement of the Law, *Agency* (at 1050), "Agent vs. Principal", § 448, "Agent as Effective Cause", § 453 (at 1064) "Compensation upon Termination . . .", and § 454 (at 1069), "Revocation in Bad Faith of Offer of Compensation" (1933); 43 A.L.R. 1103, Annotation: "Broker's right to commission where owner sells property to customer of broker at less than stipulated price" (1926) and supplement thereto at 46 A.L.R.2d 848 (1956); *Havens v. Irvine*, 61 Wyo. 309, 157 P.2d 570 (1945) with concurring and dissenting opinions; and *Leimbach v. Nicholson*, 219 Md. 440, 149 A.2d 411 (1959).

Furthermore, in view of the jury finding upon Hyder's conspiracy with Boyles on and

in connection with his tortious interference with Thompson's contract Hyder would also be liable to Thompson for the same reasons Boyles would be liable to Thompson. This will be discussed at a later point.

Reverting to Hyder apart from her liability as a conspirator: though we deem it to have been unnecessary on the tort theory, her case was submitted to the jury and its findings were against her. Based thereon there properly was a judgment for Thompson.

■ The Thompson case against Boyles is somewhat more difficult. Necessarily it must be grounded in tortious interference with the Hyder-Thompson contract. There was never any contractual right of Thompson against Boyles for Boyles never at any time had a contract with Thompson. It was Hyder alone who had a contract with Thompson. Thompson's case against Boyles rests only in tort and if it exists, it would be because of Boyles' motive to see that Thompson should not make the contracted (with Hyder) broker's commission. It was Thompson's theory that because of this, and for no purpose useful to himself, that Boyles induced Hyder to proceed with the sale of her properties to him without complying with her agreement to pay a commission by her contract with Thompson. 33 Tex.Jur.2d *Interference* § 8 at 104 ("II. Business, Trade, or Calling)—In general" (1962). Furthermore, it was Thompson's theory that Hyder was a willing accomplice in carrying out Boyles' object and purpose and to that end entered into conspiracy with Boyles; that action followed to his detriment pursuant thereto. Hence, Thompson insists, the Hyder liability in tort because of her participation with Boyles in the tort of interference.

Boyles, by his own testimony, made one particular fact perfectly clear. Before the contractually provided date by which there should be "closing" of the Hyder-Boyles sale on October 18, 1975, he had determined that he would do nothing which would create any right of Thompson to make any amount in money other than the $1,250.00 (50% of the forfeit money provided by the original contract).

Boyles' theory of his non-liability to Thompson (as well as Hyder's non-liability) was premised upon the belief that by permitting the expiration of time by which there should be "closing" under the September 13, 1975, contract Thompson would thereafter have no right of any kind. He believed that should he and Hyder enter into and consummate a "new" contract of sale on the same properties Thompson could have no legal interest and would have no right to damages from anyone. (This was also Hyder's belief and theory.)

Boyles erred. He was entitled to breach his contract of September 13, 1975, whereby his cost would be $2,500.00 as contracted if he should not, thereafter, make the purchase therein agreed upon. He was not entitled to thereafter make the same purchase with the same freedom from liability if his breach was motivated by a desire to deprive Thompson of his broker's commission to Thompson's injury for this would be an interference with Thompson's contract with Hyder and it would be improper and without justification though he be not at all enriched as Hyder would be if she became thereby relieved of her obligation to pay a broker's commission. The circumstances in themselves in such a case present evidence which raise inferences entitling the jury to find that Boyles had tortiously interfered with Thompson's contract. Furthermore, what has already been observed with reference to Hyder and the inference that she was Boyles' willing accomplice, would likewise entitle the jury to find her liable on the same ground if Boyles be found liable.

For example: assume by hypothesis that a prospective purchaser, situated as Boyles before October 18, 1975, be obliged—absent breach of contract—to consummate purchase by a certain time, decide to try to eliminate the seller's liability to pay the broker, and should explain his theory or

theories to the prospective seller and represent to the latter that by expiration of time, etc., he would be free to sell the property to him without obligation to pay any commission,—and either by express promise or by suggestion imply that thereafter the parties would go forward in consummation of the same, or substantially the same contract, by another "new" contract. It is obvious that such would amount to interference by purchaser's inducement of seller not to abide by the contract with the broker theretofore made to pay a broker's commission, or, what would amount to the same thing, to breach the contract theretofore made with the broker.

Extending the hypothesis of the example stated: and, if immediately subsequent to the expiration of time the seller and purchaser enter into and consummate what they deemed to be a "new" and independent contract in secret to substantially the same effect as their previous contract, the tortious interference with the broker's contract would be complete, with right to bring and prosecute a cause of action for any damages thereupon created.

What we mean to say is that it is more difficult to settle upon applicable law relative to Boyles' responsibility, if any, to Thompson than that relating to Hyder's responsibility; that, nevertheless, in this case the inferences permissible to be made by the jury from the evidence presented were such there was support for the jury finding that Boyles had wrongfully interfered with Thompson's contract. The applicable section in Texas Jurisprudence is 33 Tex.Jur.2d Interference § 8 (at 104) "(Business, Trade, or Calling)—In General" (1962). Texas cases have not fully developed the law on the exact question. We have, therefore, examined the general law.

In Restatement of the Law, (Torts Second) Ch. 37, "Interference with Contract", § 766, "Intentional Interference with Performance of Contract by Third Person" (1979), the experts seem to have devoted a great deal of attention to the exact question. As syllabus to the section abbreviated declarations upon the law includes the following:

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

Comment 1 (at 13) under the foregoing (§ 766) recites the following:

"*Inducement by refusal to deal.* A refusal to deal is one means by which a person may induce another to commit a breach of his contract with a third person. Thus A may induce B to break his contract with C by threatening . . . to sever business relations with B unless B does break the contract. This situation frequently presents a nice question of fact. While, . . . A may not, without some justification induce B to break his contract with C, A is ordinarily free to refuse to deal with B for any reason or no reason. The difficult question of fact presented in this situation is whether A is merely exercising his freedom to select the persons with whom he will do business or is inducing B not to perform his contract with C. That freedom is not restricted by the relationship between B and C; and A's aversion to C is as legitimate a reason for his refusal to deal with B as his aversion to B. If he is merely exercising that freedom, he is not liable to C for the harm caused by B's choice not to lose A's business for the sake of getting C's.

"On the other hand, if A, instead of merely refusing to deal with B and leaving B to make his own decision on what to do about it, goes further and uses his own refusal to deal or the threat of it as a means of affirmative inducement, compulsion or pressure to make B break his

contract with C, he may be acting improperly and subject to liability under the rule stated in this Section."

Illustration 2, under the foregoing, reads:

"2. Upon hearing of B's contract with C, A writes to B as follows: 'I cannot tolerate your contract with C. You must call it off. I am sure that our continued relations will more than compensate you for any payment you may have to make to C. If you do not advise me within ten days that your contract with C is at an end, you may never expect further business from me.' Thereupon B breaks his contract with C. A has induced the breach and is subject to liability under the rule stated in this Section."

In the same Restatement, § 767, (at 26) "Factors in Determining Whether Interference is Improper", the following is recited:

"In determining whether an actor's conduct is intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

"(a) the nature of the actor's conduct,

"(b) the actor's motive,

"(c) the interest of the other with which the actor's conduct interferes,

"(d) the interests sought to be advanced by the actor,

"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

"(f) the proximity or remoteness of the actor's conduct to the interference and

"(g) the relations between the parties."

Relative to the foregoing (§ 767) (at 27–38) on consideration of the factors, the following statements are found under the Comments:

"It is in the application of this Section that the most frequent and difficult problems of the tort of interference with a contract or prospective contractual relation arise.

"In each of these forms there is a requirement that the interference be both intentional and improper.   .   .   .

"[T]his branch of tort law has not developed a crystalized set of definite rules as to the existence   .   .   .   of a privilege to act in the manner stated in §§ 766, 766A or 766B. Because of this fact, this Section is expressed in terms of whether the interference is improper or not, rather than in terms of whether there was a specific privilege to act in the manner specified. The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.   .   .   .

"[A]t least some of the factors listed in this Section are sometimes treated as going to the culpability of the actor's conduct in the beginning, rather than to the determination of whether his conduct was justifiable as an affirmative defense. This bears on the issues of whose responsibility it is to raise the question of culpability or justification—that is, whether the interference was improper or not—in the pleadings and who has the burden of proof in the sense of the risk of nonpersuasion. Justification is generally treated as a matter of defense, but not always in the tort of interference with contractual relations. Thus a court that calls the tort 'malicious interference' and defines this as interference without justification, often decides that it is a part of the plaintiff's case to plead and prove lack of justification.   .   .   .

"*Unlawful conduct.* Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper.   .   .   .

"*Economic pressure.* Economic pressure of various types is a common means of

inducing persons not to deal with another, as when A refuses to deal with B if B enters into or continues a relation with C, . . . . The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

"*The actor's motive.* Since interference with contractual relations is an intentional tort, it is required that in any action based upon §§ 766, 766A or 766B the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct. . . . In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper. A motive to injure another or to vent one's ill will on him serves no socially useful purpose.

"*Burden of proof.* . . . This tort has not fully developed to this stage and some of the factors stated in this Section may be significant in ascertaining whether the actor's conduct is to be regarded as initially wrongful or culpable in nature. This tort is sometimes treated like the tort of negligence, with the result that it is a part of the plaintiff's case to show all of the factors making the defendant's interference improper. This is especially true in jurisdictions where the courts speak of malicious interference and define it as meaning intentional interference without justification.

"The result is that there is little consensus on who has the burden of raising the issue of whether the interference was improper or not and subsequently or proving that issue; and it can not be predicted with accuracy what rule will ultimately develop. . . . [T]he question of whether the actor was competing with the other for the prospective business of a third person might be treated as a matter of culpability for which the burden of pleading and proving would be on the plaintiff, while the question of whether there was a special relation existing between the actor and the third party making it appropriate for the actor to advise freely with the third party might be treated as a matter of justification for which the burden would be on the defendant.

"*Function of court and jury.* The jury determines whether the defendant's interference with the plaintiff's advantageous relation was intentional or not. But the cases fail to indicate clearly whether the judge or the jury makes the decision of whether the conduct was improper, or whether the function varies, depending upon the circumstances. In the case of most intentional torts, crystallized privileges have been established; and the court determines the circumstances under which a privilege exists and the jury determines what the actual circumstances are."

See also: 97 A.L.R. 1273, Annotation: "Right of real estate broker against third person who prevented broker from earning commissions, or who received, or induced owner to pay to him or another, commission which the broker had earned" (1935); 146 A.L.R. 1417, Annotation: "Real-estate broker's right to recover damages in tort upon ground that he was wrongfully prevented from earning or collecting commissions" (1943); 33 Tex.Jur.2d *Interference* §§ 1–8 inclusive (at 93) (1962); *Clements v. Withers,* 437 S.W.2d 818 (Tex.1969); *Sonnenberg v. Hajek,* 233 S.W. 563 (Tex.Civ.App.—Galveston 1921, no writ), in the expression on trend of the law beginning on p. 564, left

column at bottom, relative to liability for interference with the contract of a third person who thereby is injured.

█ The burden of proof as applied to the situation posed in this case is a factor for consideration. Our holding is that by the evidence in favor of Thompson a *prima facie* case was proved by which there was a presumption of law that fraud or similar improper motive on the part of Boyles was existent before October 18, 1975, and he had intentionally interfered with Thompson's September 13, 1975, contract with Hyder. Because of the presumption aforesaid, it became the burden of Boyles to eliminate its force by counter evidence in explanation and justification; and should this not be done there would be no compelling need for special issue findings in his favor for Thompson to be entitled to a judgment. *Bryant v. Kelton & Uzzell,* 1 Tex. 415 (1846). It is our opinion that neither the evidence of Boyles or of Hyder amounted to explanation and justification which made necessary the submission of the fraud question to the jury. It was the erroneous theory of both that no *prima facie* case had been proved by Thompson. Of course, whether necessary or not, there was submitted to the jury the question upon wrongful interference by Boyles with the Thompson contract "without right of justifiable cause" on the part of Boyles—and on the special issue the burden of proof was placed on Thompson. Perhaps we have included mere dicta in our opinion at this point.

Defensively Boyles and Hyder contended that the one and only contract of Thompson with Hyder, that of September 13, 1975, came to an end; with Boyles discharged by performing the contractual provision for delivery over to Hyder and Thompson of Boyles' $2,500.00 as liquidated damages to Hyder; and with Hyder discharged by the delivery over to Thompson of $1,250.00 of the $2,500.00. In other words their contention is that before the "new" contract of sale of the same properties (from Hyder to Boyles), was ever agreed to be made the

duties of anyone to Thompson had terminated and were at a final end—never to be reinstated—and, regardless of anything done or permitted by Boyles and Hyder, or either of them, impossible to supply the basis of any claim by Thompson on that or on the "old" contract. They both insist that Thompson's receipt of $1,250.00 (of the $2,500.00) was completion and final settlement of the Hyder-Thompson contract, and the payment to him of his agreed "liquidated damages". Of course, there was nothing in the contract relative to any liquidated damages for Thompson.

Upholding the decision of the lower court that there had been tortious interference with the plaintiff's contract it was written by the court in *So. Cent. Livestock, Etc. v. Sec. State Bank, Etc.,* 551 F.2d 1346, 1351 (5th Cir. 1977), viz:

"Under Texas law, a tortious interference with a contract entails intentional and willful acts calculated to cause damage and with the *unlawful purpose of causing* damage to the contracting parties without just cause or lawful right." (Followed with citations to many Texas cases and cases in the 5th Circuit Court of Appeals to which Texas law would be applicable.)

By the same court in another Texas case another judgment relative to a Texas transaction was upheld in *Leonard Duckworth, Inc. v. Michael L. Field & Co.,* 516 F.2d 952, 956 (5th Cir. 1975). Therein the court wrote:

"Recovery for malicious or tortious interference with contractual relations has been permitted specifically in real estate situations such as the instant case. *See Myers v. Arcadia,* 73 N.J.Super. 493, 180 A.2d 329 (1962). In *Myers,* a real estate broker brought suit against a buyer of property for the loss of his commission after the buyer secretly negotiated with the property owner for the sale of certain real estate. When the buyer and seller subsequently entered into a contract of sale, the broker claimed that he brought

the parties together and was therefore entitled to his commission. The court in agreeing with the plaintiff's position stated:

'We hold that the rule to be applied in a case such as the one at bar is that the broker may recover when the jury is satisfied that but for the wrongful acts of the defendant it is *reasonably probable* that the plaintiff would have effected the sale of the property and received a commission'."

We hold against the Hyder and Boyles complaints relative to evidence and jury findings on Boyles' interference and on the fact that Boyles and Hyder had conspired. The evidence was sufficient. The jury findings for Thompson were not so contrary to the greater weight and preponderance of the whole of the evidence in the record as to be clearly erroneous.

True is that which was stated a long time ago: that when men enter into conspiracies they are not likely to call in a witness. They resolve their schemes clandestinely and in secret. Their purpose is imposition and deception; and secrecy is necessary to its accomplishment. In such cases the injured party must necessarily have recourse to circumstantial evidence. For it is only by the inferences and deductions which men properly and naturally draw from the acts of others in such cases, that their intentions can be ascertained. They are not likely to proclaim them in the hearing of witnesses. *Jernigan v. Wainer*, 12 Tex. 189 (1854); 12 Tex.Jur.2d § 20 (at 340) *Conspiracy* "Evidence" (1960).

■ There is complaint on appeal because of the absence of a special issue,— conditioned upon the jury's finding that Boyles did interfere with Thompson's right to commission, as the jury found,—making the further inquiry about whether such amounted to a proximate cause of Thompson's damages. We have examined the objections and exceptions taken to the court's charge to the jury and find no properly presented objection to absence of such a special issue. Under these circumstances, such an issue, not being an independent ground of recovery but one necessarily referable to the interference finding, the issue of proximate cause is to be deemed as found by the trial court in support of the judgment. Tex.R.Civ.P. 279 "Submission of Issues". Actually, in this case, the fact of Boyles' interference was proximate cause of Thompson's damages as a matter of law.

■ It is true that in the objections and exceptions taken relative to one special issue, that in answer to which the jury did find Boyles' interference to have existed, were complaint reasons given letters (a) to (j), inclusive, and in the last of these there was the objection to the submission of that issue because "there is no submission to the jury as to whether such interference was a proximate cause of the alleged injury to Plaintiff". This objection to a different special issue, even if it not be deemed concealed within a mass of objections, would not suffice to preserve the error, if any, because of the omission of another conditionally submitted proximate cause issue.

■ In the court's charge there was not submission of any issue on actual damages, though there was submission on the question of exemplary damages. The jury refused to find exemplary damages. The judgment rendered and entered was one which gave Thompson the exact amount which he would have earned had the initial contract between Boyles and Hyder been completed, with consideration paid. In other words, that awarded Thompson was the amount to which he was entitled had there been a specific performance of his contract with Hyder. The same amount, in law, would be the damages to which Thompson would be entitled because of the loss of his bargain. There was no evidence in the record raising any question but that Thompson's damages as the result of the breach of his contract and as result of Boyles' interference resulting in such

breach of contract would have been anything other than those to which he would be entitled by loss of his bargain. There was no error in failure to submit the issue for under these circumstances the court did not err in rendering judgment as it was made for the correct amount as the legal measure of damages. Restatement of the Law (Torts Second), Ch. 37, "Interference with Contract", § 774A "Damages" (at 54) (1979).

■ Reference is here made to Special Issue No. 1. By complaints directed to this issue in objections and exceptions Hyder and Boyles contended that the proper burden was not placed on Thompson to the prejudice of his opponents, because it was too broad, vague, and comprehensive in that it permitted the jury to find conspiracy upon the moral standard of doing that "which is wrongful and harmful toward another person" without a concerted action to accomplish an unlawful purpose or doing some purpose by unlawful means;—further, because it contained incomprehensible language "to carry out an object", thereby permitting the jury to speculate without restriction in its consideration and finding of a concerted action to accomplish an unlawful purpose or some purpose by unlawful means.

Error is further assigned to the refusal of the trial court to submit the defendants' requested jury instruction reading: "Conspiracy, as that term is used herein, is by combination of two or more persons by agreement and by concerted action to accomplish an unlawful purpose or some lawful purpose by unlawful means."

We approve the definition of "conspiracy" given by the court in its charge. Having done so as applied to the definition we overrule the complaint presented because the court refused to submit Hyder's and Boyles' specially requested issue.

■ We also overrule the complaints leveled against the issue which was submitted to the jury, incorporating the instruction upon that which constitutes "conspiracy".

Our conclusion is that Hyder was bound by contract to pay Thompson his agreed commission. The evidence is without dispute that she intentionally withheld it from Thompson in the erroneous belief that she had successfully escaped any liability by rules of law. She did owe the commission by contract. Her refusal to pay it was breach of contract; and the manner in which it was done made of it a tortious breach of contract. Her participation with Boyles in his interference constituted additional tort. She was liable to Thompson both in contract and in tort, though it makes no difference whether recovery from her be on the one theory or the other in this instance for the measure of Thompson's recovery is the same under either theory.

In the instant case the jury's answer to Special Issue No. 1 had little essential effect. It did remove any question but that both Boyles and Hyder, as conspirators, each became party to all acts done by the other in pursuance of the conspiracy. *Bourland v. State*, 528 S.W.2d 350 (Tex.Civ.App.—Austin 1975, writ ref'd n. r. e.). Of course, it is in the action pursuant thereto and not the fact it was the result of a conspiracy that any cause of action would accrue to one suffering injury as a consequence. While in this case it enabled Thompson to show Hyder's liability under tort as well as by contract law it was not essential so to do to establish Hyder's liability. Furthermore, under all the circumstances the points of complaint relative to Special Issue No. 1 are overruled because of Tex.R.Civ.P. 434, the Texas "harmless error rule".

■ Reference is hereby made to Special Issue No. 2. By complaints directed to this issue in objections and exceptions Boyles contended that there was error because (a) of failure to inform the jury as to the meaning of the words "without right of justifiable cause on the part of the one interfering"; (b) of failure to inform the jury that a person may lawfully refuse to have business relations with another person

for any reason including whim, caprice, prejudice or will; and (c) of failure to instruct the jury that a person may lawfully induce others to refrain from having business relations with a third person, although it is injurious to such third person, provided the first person acted in the subservience of a legitimate interest of his own.

Because of the jury's finding that Thompson's efforts was the procuring cause of the sale made by Hyder, considered in connection with the provisions of the contract of September 13, 1975 (relative to Hyder's responsibilities to Thompson), was established his contractual right to the agreed commission from Hyder. On this we have written heretofore. By the instruction given the jury in the court's charge when they found that Boyles interfered with such right of Thompson it also found that without right of justifiable cause Boyles acted willfully and intentionally in a way calculated to cause and which did actually cause damage to Thompson.

In considering the complaints by points of error there is necessity to consider the evidence. When this is done it is inescapable that the jury was entitled to infer from facts proved that prior to what both Boyles and Hyder consider to have amounted to the termination of Thompson's rights by the contract of September 13, 1975, Boyles had suggested to Hyder and Hyder had agreed to exactly what did later occur, to-wit the failure to close as contracted between Boyles and Hyder and the payment of the $2,500.00 of Boyles' money as provided by the contract, promptly followed by a consummation of the identical contract—as between Hyder and Boyles, but with Thompson excluded. We have heretofore held that there was no evidence of any "justifiable cause" for Boyles' interference. Furthermore, Boyles did not refuse to have business relations with Hyder, for whom Thompson was agent, but with Thompson in the capacity of agent. Boyles' desire was to inhibit or at least discourage Hyder from having business relations with her agent

Thompson without excuse of proper reason, and, more importantly, because it is what is involved, to cause Hyder to attempt to deny Thompson's right to payment for his services in her behalf. (Of course, there was Hyder's payment to him $1,250.00 of the $2,500.00 she is to be deemed to have received of Boyles' money.)

Under the circumstances the complaints in question were without merit as inappropriate in view of the evidence, or want of evidence to demonstrate any justifiable cause for Boyles, and furthermore inapplicable because Thompson's services to Hyder were already performed relative to the initial Hyder-Boyles contract. In any event the points in which there was complaint are also overruled because of Tex.R.Civ.P. 434, the Texas "harmless error rule".

■ There is complaint because of the refusal by the trial court to submit the defendant's specially requested issue, reading: "Do you find . . . the conduct of Thomas D. Thompson, plaintiff, in insisting upon either a closing of the three contracts dated September 13, 1975, or forfeiture of the $2,500.00 . . . of the said contracts on October 18, 1975, and the acceptance of such escrow funds, constituted a completion and termination of such contract?"

The jury refused to find for Hyder and Boyles, or at least for Hyder, upon special issue No. 7, that the acceptance of the $2,500.00 of Boyles' money by Hyder and Thompson's acceptance of 50% thereof, $1,250.00, from Hyder was an accord and satisfaction by each of them of their rights under the contract in question. This issue and the findings returned by the jury thereto is not attacked. It was the proper inquiry. The special issue requested would at most amount to another phase or different phase of the inquiry made by special issue no. 7, and, as such, should not be submitted by express provision in our Rules of Civil Procedure. Tex.R.Civ.P. 279, "Submission of Issues". If there was a completion and

termination of the parties' several rights under the contract of September 13th it could only have occurred by performance and consideration by way of performance or by accord and satisfaction of claims arisen or which might arise under the same contract as the result of its breach. Undisputed is that rights were not extinguished by specific performance, so the only proper inquiry by which Hyder and Boyles' affirmative defense might be presented was that which was made to the jury relative to accord and satisfaction. The trial court did not err in refusing to submit the specially requested issue.

Judgment is affirmed.