ALFRED P. SCHECHTER and JOHN J. ARISIO, partners, trading as Arco Sales Associates, complainants-respondents,

*v.*

BENJAMIN FRIEDMAN, ABE FRIEDMAN and IRWIN S. FRIEDMAN, partners, trading as National Sales Company, defendants-appellants.

[Submitted October term, 1947.   Decided January 29th, 1948.]

*Mr. Isadore H. Colton,* for the complainants-respondents.

*Mr. Peter Cohn (Mr. Meyer E. Ruback,* of counsel), for the defendants-appellants.

The opinion of the court was delivered by

EASTWOOD, J.

Defendants-appellants appeal from a decree of the Court of Chancery advised by Vice-Chancellor Grimshaw on the opinion filed by his predecessor, Vice-Chancellor Lewis, directing appellants to pay to the respondents the sum of $4,539.47 with interest thereon from April 19th, 1946, being the amouht found due respondents by the master appointed for that purpose as the profits realized by appellants from their business dealings with the Master Kitchen Equipment Company, of Rochester, New York. Master Kitchen Equipment Company is not a party to the litigation and will hereinafter be referred to as Master. Appellants were further decreed to pay the sum of $250 to Harry Schoen, special master, for his services; a counsel fee of $400 and taxed costs to respondents. We are in accord with the result achieved by the court below.

Respondents' bill of complaint prayed for injunctive relief against the appellants' interference with an exclusive contract claimed to be in existence between respondents and Master, together with an accounting for any profits that may have accrued to appellants arising out of the alleged interference.

The respondents Schechter and Arisio, together with the appellants Benjamin Friedman and Abe Friedman, were, prior to December 18th, 1944, engaged as a partnership known as Arco Sales Associates in the City of Paterson, New Jersey, as jobbers' and manufacturers' representatives, whereby the partnership acted as wholesale distributors representing manufacturers in the sale of their products to restaurant equipment dealers. Among the many manufacturers represented by Arco Sales Associates was Master, with whom said firm had transacted business for several years prior to December 18th, 1944. During this time Arco Sales Associates consisting of Schechter, Arisio and the two Friedmans, also owned all of the issued stock of the New Jersey Valve & Equipment Company, a New Jersey corporation, which was then engaged in the business of building beer dispensing equipment.

Master was a co-partnership comprised of Americo Blure and Patsy Blure, brothers. They were the owners of a very small manufacturing plant located at Rochester, New York, employing about six workmen and having a very limited productive capacity and supply of materials. Master's business was that of manufacturing restaurant sinks and other related items. Arco Sales Associates had placed many orders with Master, but at the time in question, Master was behind in its deliveries of these orders due to its limited productive capacity.

Various differences having arisen between Schechter and Arisio on the one hand and the appellants Benjamin and Abe Friedman on the other, it was decided to dissolve the then existing partnership. In furtherance thereof Schechter and Arisio purchased the interests of Benjamin and Abe Friedman in Arco Sales Associates, paying them the sum of $21,950, and in addition thereto Schechter and Arisio transferred to them their stock holdings in the New Jersey Valve & Equipment Company.

Respondents continued the business of Arco Sales Associates; they filed a new trade name certificate showing themselves to be the owners of the business; notification of the change in ownership was sent to the old customers, and manufacturers with whom they had dealt were notified of that fact. Among the latter so notified was Master who immediately requested the respondents to come to Rochester to see them. There is testimony in the case to the effect that the Friedmans were likewise notified and requested to confer with Master on the same day as Schechter and Arisio, who were then conducting the business of the new Arco Sales Associates. Schechter and Arisio conferred with the Blures in their office in Rochester at a conference on December 28th, 1944, and at that time a written agreement or contract was entered into between the respondents and Master granting to the respondents the exclusive right of distribution of Master's products for a period of two years with the privilege of renewal, unless either party terminated the contract on 60 days' written notice prior to the expiration date of the contract or any renewal thereof. It is claimed by the appellants that on the same

day, December 28th, 1944, Irwin S. Friedman, representing the appellants, had also come to Rochester in response to Master's invitation for the purpose of conferring with Master, but that he was put off and kept waiting while Schechter and Arisio were negotiating with Master with the result that he, Friedman, did not see the Blures until the following day. Parenthetically, it may be observed that the appellants, following their separation from the respondents on December 18th, 1944, had formed a new firm under the name of National Sales Company, consisting of Benjamin Friedman and Abe Friedman, and in addition thereto the said Irwin S. Friedman, who is a member of the New Jersey bar, and was previously employed by the old Arco Sales Associates as its office manager. Irwin S. Friedman is the son of Benjamin Friedman and nephew of Abe Friedman.

The appellant Irwin S. Friedman on his visit to Master at Rochester was informed by Master, if the testimony of respondents is to be credited, that it had entered into an exclusive contract with the respondents. It was testified that the contract was exhibited by Master to him and that he read it; and further, that he then advised Master that the contract was of no effect at law and suggested to Master that Master attempt to get the contract back from Schechter and Arisio by subterfuge and destroy it. Additionally, it is claimed that he told Master that respondents' financial standing was poor; that respondents' customers were canceling their orders for the restaurant sinks; that he, Irwin S. Friedman, had numerous orders for Master's products which he had obtained in Rochester that day or the day previous; that he could and would obtain for Master all the raw materials needed by them to manufacture sinks; and that he was then ready to place an order on behalf of National Sales Company for 1,000 sinks. It is further contended that the appellant Irwin S. Friedman did all this notwithstanding that he had actual knowledge of the exclusive contract between Master and the respondents, and that all of this was done for the purpose of inducing Master to breach their contract with respondents. Finally, it is said that he urged Master to violate respondents' contract by selling not only to respondents but also to appel-

lants. The foregoing allegations were attempted to be denied or refuted by the appellants.

It is clear to us that appellants' plan to induce Master to breach respondents' contract met with success. As the result of Friedman's negotiations, appellants induced Master to accept from them an order for 1,000 sinks on account of which appellants tendered Master a check for $1,500. This order required delivery to appellants of approximately 250 sinks per month. It is said by respondents that the purpose of the appellants in persuading Master to accept this order was to place Master in a position where, by reason of its totally inadequate production capacity, they could not fulfill the order and would thereby subject themselves to suit for damages. In that way, so it is claimed, the appellants would have the upper hand on Master and would force Master under threat of suit for damages to ship merchandise to appellants in violation of respondents' exclusive contract. It seems obvious, and it is borne out by the testimony, that Master could never have produced the required 250 sinks per month with the limited number of workmen it employed and with its limited source of supply of necessary raw materials. It was testified on behalf of the respondents that when Master hesitated to accept appellants' order for 1,000 sinks the appellant Irwin S. Friedman assured them that they could accept the order without incurring any liability to Arco Sales Associates, and made further assurances that in the event any liability for damages resulted from Master's acceptance of appellants' order, that they, the appellants, would assume it.

Appellants' order of 1,000 sinks was accepted by Master, as well as the check for $1,500 on account of the purchase price. Thereafter in February of 1945 the appellant Irwin S. Friedman and one Harold Halpern, a member of the New York bar, came to Master's office in Rochester and, it is said, threatened suit because of non-delivery of the order. Again, in May of 1945 they are claimed to have threatened Master with suit because the order was still unfulfilled. On the latter occasion the Blure brothers, in the presence of Irwin S. Friedman and attorney Halpern, conferred with Master's own counsel, Mr. Wedmeyer, who it is said advised his clients,

the Blure brothers, to fill the order for 1,000 sinks at once. We pause to observe that at this time, the early part of 1945, the war was still in progress, labor was scarce, and materials very difficult to obtain. Master began to ship sinks to the appellants. Their shipments to respondents ceased. The result was, of course, that the appellants were getting sinks and selling them to the trade to whom the respondents would normally have sold if they could have obtained delivery from Master.

The decree appealed from is said to be erroneous, and we are asked to set it aside, on the ground that the Court of Chancery is without jurisdiction to grant respondents relief, on the theory that the contract between respondents and Master-Kitchen Equipment Company never came into existence, and that even assuming it did arise its terms were not specifically enforceable. Without passing upon the validity of the contract between respondents and Master of December 28th, 1944, this contention is without substance. In our opinion, even assuming that its terms were not enforceable by specific performance, certainly a third person could not assume and determine that question and actively interfere with it. Under our ruling in *The Aalfo Co.* v. *Kinney, 105 N. J. Law 345; 144 Atl. Rep. 715,* Chief-Justice Gummere, speaking for this court, stated the rule to be that third persons interfering with a contract, although the same might be unenforceable, become liable for damage to such party, stating the rule in the following succinct language:

"In our opinion, the direction of a nonsuit cannot be justified upon the ground stated by the trial court as the basis of its action. The mere fact that a contract is unenforceable between the parties affords no justification for the act of a third person, who, for his own purposes, takes steps which prevent its performance by one of the parties to it, who, although not bound to execute it, is willing and anxious to do so. Assuming that the contract now before us was unenforceable against the Blake Company for the reasons stated by the trial court, that fact did not constitute a bar to its performance by the company. The further performance of the contract, if the question of the wisdom thereof was

raised, was a matter to be determined by its board of directors, the representatives of the stockholders, and which presumably would take such action in relation thereto as would best protect the parties that they represented. The act of third parties, even though stockholders, in maliciously and without legal justification preventing the performance of the contract, although both the parties thereto desire to execute it, renders such third persons liable in damages to either of the contracting parties that suffers injury as the direct result of such act."

There was ample evidence to substantiate respondents' contention that the acts of appellants were prompted by a desire, both malicious and unjustifiable under the circumstances, to secure for themselves the entire production of sinks manufactured by Master, with full knowledge of the then existing contract between respondents and Master. In so doing they have brought themselves within the condemnation of the rule enunciated in *The Aalfo Co.* v. *Kinney.* The interference of appellants with the contractual relationship existing between respondents and Master is also condemned in the leading case of *Louis Kamm, Inc.*, v. *Flink, 113 N. J. Law 582; 175 All. Rep. 62.* Mr. Justice Heher, speaking for the Court of Errors and Appeals, therein said :

"The case pleaded falls naturally into the classification of an actionable infringement of a property right, *i. e.,* the right to pursue one's business, calling or occupation free from undue interference or molestation. The wrongful act charged was the *malicious* interference with appellant's business. Its object and consequence, so the complaint charges, was the deprivation of the business and profit that would otherwise have accrued. Natural justice dictates that a remedy shall be provided for such unjust interposition in one's business. The luring away, by devious, improper and unrighteous means, of the customer of another is, on principle, an actionable wrong, if damage ensues.

"'* * * If disturbance or loss comes as a *result of competition, or the exercise of like rights by others,* it is *damnum absque injuria,* unless some superior right by contract or otherwise is interfered with. But if it comes from the *merely wanton or malicious* acts of others, without the

*justification of competition or the service of any interest or lawful purpose,* it then stands upon a different footing.' Mr. Cooley states the general rule as follows: 'An injury to a person's business by procuring others not to deal with him, or by getting away his customer, if unlawful means are employed, such as fraud or intimidation, or if done *without justifiable cause,* is an actionable wrong.' *2 Cooley Torts,* § *230."*

The malice required to sustain the action need not be personal ill-will toward a person in its common acceptation or popular sense. As was said in *Louis Kamm, Inc., v. Flink:* "Self-enrichment or fraternal interest, and not personal ill-will, may well have been the motive."

We are convinced from the proofs that there was actionable interference with respondents' contract on the part of appellants and that such conduct and the resulting financial/loss actually suffered by respondents were remediable in equity. The court below properly decreed "that an accounting should be had of the profits realized by the defendants  *  *  *," which profits, as the result of such an accounting, were ascertained and decreed to be the sum of $4,539.47. The fees allowed to the master on the accounting and to counsel were also reasonable and proper.

Although the learned Vice-Chancellor denied injunctive relief to the respondents on the grounds that the question had become moot by reason of the passage of time, it was nevertheless within the province of Chancery to retain the cause for the purpose of an accounting to ascertain defendants' profits arising out of said transaction.

The decree below is affirmed.

*For affirmance*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, WACHENFELD, EASTWOOD, BURLING, WELLS, DILL, FREUND, McLEAN, SCHETTINO, JJ. 12.

*For reversal*—COLIE, J. 1.