757 F.2d 1401
 The ZIPPERTUBING CO. and Surf Chemical, Inc.
v.
TELEFLEX INCORPORATED and Surf Chemical, Inc.
SURF CHEMICAL INCORPORATED
v.
TELEFLEX INCORPORATED
Appeal of TELEFLEX INCORPORATED.
 No. 84-5518.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 5, 1985.
Decided March 22, 1985.
 
 Gordon W. Gerber (argued), Richard R. Rulon, Robert A. Limbacher, Dechert, Price & Rhoads, Philadelphia, Pa., for appellant Teleflex Incorporated; Eugene M. Haring, Richard M. Eittreim, McCarter & English, Newark, N.J., of counsel.
 Robert E. Cartwright (argued), Cartwright, Sucherman & Slobodin, Inc., San Francisco, Cal., for appellees The Zippertubing Co. and Surf Chemical, Inc.; Wm. Douglas Sellers, Sellers & Brace, Pasadena, Cal., Gregory C. Parliman, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., Thomas C. Hart, Louis A. Ruprecht, McDermott, McGee & Ruprecht, Millburn, N.J., of counsel.
 Before SEITZ, GIBBONS and SLOVITER, Circuit Judges.OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 In this diversity case Teleflex Incorporated (Teleflex) appeals from a judgment in favor of the plaintiffs, The Zippertubing Co. (Zippertubing) and Surf Chemical, Inc. (Surf) in their action for interference with a prospective advantage. The parties agree that New Jersey law governs. The case was tried to a jury, which awarded Zippertubing and Surf $2,000,000 in compensatory damages and $750,000 in punitive damages. The trial court added $345,862.96 to the award in the form of prejudgment interest which was based on the $2,000,000 compensatory damage recovery. Teleflex moved for judgment notwithstanding the verdict, or, alternatively, for a new trial. Those motions were denied, and this appeal followed. We affirm.
 
 I.
 The Facts the Jury Could Have Found
 
 2
 Zippertubing is a designer and supplier of closeable insulation. Closeable insulation may be placed around wires and cables in place, and closed by a track closure device which holds the insulation in tubular form. Zippertubing has over the years developed several types of track closure devices. Zippertubing customarily advises its customers of the best type insulation and closure for their needs, and then has the product extruded by an outside extruder who uses Zippertubing's dies. Zippertubing does not have its own extruding facility, and has always subcontracted the actual fabrication of insulation of its design to a number of extruding houses. Solely a supplier, Zippertubing does not install the product. In the narrow field of closeable insulation Zippertubing has achieved a 90% market share.
 
 
 3
 In 1980 the New York City Transit Authority approached Zippertubing about reinsulating its R-46 subway cars. Zippertubing was not interested in contracting to install the insulation. A New York construction firm, Nab Construction, bid on the job against one other bidder, and was awarded the contract for a gross price of $10,400,000. Thereafter Nab approached Zippertubing, which was extremely interested in furnishing the insulation. Charles Mehling of Zippertubing was placed in charge of effecting the sale. After conferring with Nab and the Transit Authority, and examining the specifications for the job, Zippertubing undertook to find an extrusion house with sufficient capacity to manufacture the quantities of insulation required.
 
 
 4
 Based on a favorable recommendation from a west coast extruder, itself unable to do the job, Zippertubing approached Surf. Surf was interested in doing the extruding, but concluded that because 50,000 feet per month would be required, it could not supply the whole amount. Teleflex, a company with which Surf had dealt on a prior occasion, had an extruding plant nearby in New Jersey. Surf approached Teleflex, which gave Surf an oral quotation for the extruding. Surf in turn gave an oral quotation to Zippertubing. Zippertubing then advised Nab that it could supply the insulation for $4.90 per foot on average for the five sizes of closeable insulation required.
 
 
 5
 Nab was satisfied with the quotation, and requested Zippertubing to firm up the matter in writing. On February 4, 1981 Zippertubing sent Nab a draft contract, together with exemplars of the different types of track closing devices which it could furnish. On February 9, 1981 representatives of Nab visited Zippertubing's Los Angeles office. They reviewed the draft contract and arrived at a meeting of the minds on almost all particulars. Mr. Simpson of Nab, aware that Zippertubing did not perform the extruding, expressed the desire, before signing the contract, to inspect the facility which would actually fabricate the material, in order to satisfy himself that the extruder had the ability to produce. Zippertubing advised Simpson about Surf's facility, and that it would arrange for an inspection as soon as possible. Nab and Zippertubing discussed the relative merits of a "hook lock" and an "arrow lock" closing device, both of which were Zippertubing designs, and either of which could be supplied. A revised Nab-Zippertubing contract was prepared, and signed on behalf of Zippertubing the same day. Zippertubing also prepared a purchase order to Surf for the extruding, and drew a $10,000 check to Surf's order as a down payment. Mehling of Zippertubing made an appointment to meet with Surf at its New Jersey plant on Wednesday February 11, 1981, and on Tuesday night flew to New Jersey. Meanwhile on February 10, Teleflex issued Surf a quotation "firm for 30 days" for the extrusions, in which Teleflex agreed "to hold these prices for a period of 12 months, based on a blanket order for entire quantity." App. 2738.
 
 
 6
 On February 11, Mehling was advised that Surf felt it did not have the capacity to turn out the product fast enough, and had accordingly secured a quotation from Teleflex for the extruding. Mehling informed Surf that Nab's inspection of the extruding facility was the sole step remaining for consummation of the agreement. Surf called Teleflex, advising that its customer desired to meet with Teleflex. Messrs. Whitney and Brunner of Surf and Mehling of Zippertubing then went to the nearby Teleflex plant. There they met with Michael Perrera, General Manager, Thomas Hardiman, National Sales Manager, and three other Teleflex executives. Mehling was assured that Teleflex was willing and able to do the extruding for the job at the quoted price and in the required quantities. He then advised that the customer desired to inspect the extrusion facility to satisfy itself of the plant's capacity. Teleflex agreed, and scheduled the inspection for the following morning at 10:00 a.m. Believing that Teleflex had agreed to perform the extrusions for Surf and Zippertubing, Mehling, for the first time, revealed that Nab Construction Company was the customer, and that the insulation was destined for the New York City Transit Authority. The meeting was adjourned, and Mehling called Simpson of Nab to arrange for the scheduled inspection on the next morning.
 
 
 7
 After Mehling and the Surf representatives left the Teleflex plant, Thomas Coneys, a Teleflex vice-president, and Mr. Perrera, agreed to by-pass Zippertubing and Surf. Coneys called Simpson. He told Simpson that Teleflex had an unannounced visit from Zippertubing and Surf; that he was informed about the proposed meeting on the following day; and that Simpson could visit the plant, but because Zippertubing and Surf were competitors of Teleflex, he could not permit them to visit. In fact the visit was not unannounced and Teleflex was not a competitor of Zippertubing and Surf in the closeable insulator business. It had never manufactured closeable insulation. Coneys invited Simpson to come at the appointed time. He then instructed Mr. Hardiman to call Surf and advise that the scheduled meeting was "off" because Teleflex was having "second thoughts." Hardiman was not informed that the Simpson meeting was "on." Hardiman made the call to Surf, and at 4:45 that afternoon Surf informed Mehling.
 
 
 8
 Mehling called Simpson to advise him that the meeting was "off", but Simpson told Mehling about the conversation with Coneys. Simpson and Mehling agreed that Simpson should go to the Teleflex plant at the appointed time to satisfy himself as to Teleflex's capability to make the extrusions, and that Mehling should endeavor to get the transaction between Zippertubing and Surf and Teleflex back on track. Mehling and Brunner called Mr. Hardiman to arrange for another meeting with Surf and Zippertubing, and such a meeting was scheduled for 4:00 p.m. on February 12.
 
 
 9
 On that date Simpson kept the 10:00 a.m. appointment with Coneys and Perrera. Hardiman, who was scheduled to meet that afternoon with Mehling, was not told of the meeting with Simpson. After inspecting the facility, Simpson concluded that Teleflex was able to do the extruding. He was informed, however, that Teleflex would only deal directly with Nab. Simpson regarded Teleflex as a subcontractor to its supplier, Zippertubing, and would not normally have dealt directly with a subcontractor, but by then Nab had been awarded the Transit Authority contract and was subject to severe penalties if it did not perform. When the subject of Simpson's concern for by-passing Zippertubing came up, Coneys suggested that Teleflex would take care of Zippertubing with a finder's fee. No such fee was ever offered.
 
 
 10
 After the meeting with Coneys and Perrera, Simpson called Mehling and told him that Teleflex would now deal only directly with Nab. Simpson also related Coneys' assurances, precipitated by Simpson's distress about cutting Zippertubing out of the deal, that Teleflex would take care of Zippertubing.
 
 
 11
 Hardiman met with Mehling and the Surf representatives at 4:00 p.m. With a serious and grim demeanor, Hardiman gave what appeared to be a memorized statement as to why Teleflex would not deal with them. When pressed for particulars he mentioned the risk of doing business in New York, the risk in the design which they were asked to produce, the unwieldiness of supplying through Surf and Zippertubing, and safety considerations with respect to the Zippertubing design. When asked if there were any changes Teleflex would suggest, he answered no. By then Hardiman had been made aware that Teleflex intended to deal directly with Nab. He did not inform Mehling or the Surf representatives of that fact. The next day Hardiman was fired.
 
 
 12
 Within two working days of the eventful February 12, Teleflex contracted with Nab. Under its quotation to Surf Teleflex would have received $1,100,320.00 and made a net profit of $715,205. Under its arrangements with Nab it would receive $2,250,238.00 and make a net profit of $1,845,195.00. Its average price per square foot of extruded material rose from $2.52 to $5.26. Subsequent modifications of the Nab-Teleflex contract increased Teleflex's revenue to $3,259,248.00 and its profit to something in excess of $2,000,000. On February 18, 1981 an attorney for Zippertubing warned Teleflex in writing that if it proceeded with the wrongful appropriation of Zippertubing's client, it would do so at its peril, and a suit would be filed.
 
 II.
 Teleflex's Contentions
 
 13
 Zippertubing filed suit on June 19, 1981. Surf filed its action on August 14, 1981, and the cases were consolidated for trial. Both sought compensatory and punitive damages. The trial resulted in the judgment described above. Teleflex contends that it is entitled to a judgment notwithstanding the verdict on the entire case; that the court's charge misstates New Jersey laws; that the plaintiffs' disgorgement of profits theory of recovery cannot be sustained; that it is at least entitled to a judgment notwithstanding the verdict with respect to punitive damages; that prejudgment interest should not have been awarded; and that trial errors warrant a new trial.
 
 
 14
 A. Sufficiency of Plaintiffs' Evidence on Interference with
 
 
 15
 a Prospective Advantage
 
 
 16
 Having made a firm quotation to Surf, which was by its terms to remain open for thirty days and which would have produced a $715,205 profit if accepted, Teleflex was asked by Surf and Zippertubing to permit their customer Nab, until then undisclosed, to inspect its facilities. Teleflex agreed to the inspection. It contends that in these circumstances New Jersey law would not impose any obligation on it to refrain from taking actions which would interfere with the prospective contract between Zippertubing and Nab, even when those actions amount to Teleflex's making false representations to Nab with respect to its relationship with Zippertubing and Surf, and Teleflex's resort to deceit in its dealings with Zippertubing and Surf with regard to its intention to make the extrusions.
 
 
 17
 The law of New Jersey is otherwise. Tort liability for interference with a prospective advantage has been a settled feature of that state's law for many years. The cause of action was recognized years ago for inducing the termination of an at-will employment relationship. E.g., Frank v. Herold, 63 N.J.Eq. 443, 52 A. 152 (Ch. 1901), appeal dismissed, rehearing denied, 64 N.J.Eq. 371, 51 A. 774 (1902); Jersey City Printing Co. v. Cassidy, 63 N.J.Eq. 759, 53 A. 230 (Ch. 1902); George Jonas Glass Co. v. Glass Bottle Blowers' Ass'n, 77 N.J.Eq. 219, 79 A. 262 (1911). The cause of action was available against third parties even on behalf of an at-will employee who could not recover in contract against his former employer. Brennan v. United Hatters of North America, Local No. 17, 73 N.J.L. 729, 65 A. 165 (1902). These at-will employment cases, however, are examples of a more general principle. In Van Horn v. Van Horn, 56 N.J.L. 318, 28 A. 669 (1894) the tort was recognized in favor of a retailer whose supplier was induced to withhold favorable credit terms. In that well known case the Court of Errors and Appeals cited with approval two famous cases from other jurisdictions, Lumley v. Gye, 118 Eng.Rep. 749 (1853) and Walker v. Cronin, 107 Mass. 555 (1871) dealing with interference with prospective employment. 56 N.J.L. at 322, 28 A. at 670. The Van Horn court observed:
 
 
 18
 The rule to be deduced from these cases, and one which has most ample support, is that while a trader may lawfully engage in the sharpest competition with those in like business, by holding out extraordinary inducements, by representing his own wares to be better and cheaper than those of others, yet when he oversteps that line, and commits an act with the malicious intent of inflicting injury upon his rival's business, his conduct is illegal, and, if damage results from it, the injured party is entitled to redress. Nor does it matter whether the wrongdoer effects his object by persuasion or by false representation. The courts look through the instrumentality or means used to the wrong perpetrated with malicious intent, and base the right of action on that.
 
 
 19
 Id. at 323, 28 A. at 670. Consistent with its roots in cases dealing with at-will employment, moreover, the cause of action in New Jersey does not depend upon the existence of a legally enforceable relationship. "The mere fact that a contract is unenforceable between the parties affords no justification for the act of a third person, who, for his own purposes, takes steps which prevent its performance by one of the parties to it, who, although not bound to execute it, is willing and anxious to do so." Aalfo Co. v. Kinney, 105 N.J.L. 345, 347, 144 A. 715, 716 (1929).
 
 
 20
 The leading New Jersey case dealing with the tort of interference with a prospective advantage is Justice Heher's opinion in Kamm v. Flink, 113 N.J.L. 582, 175 A. 62 (1934). In that case the Guarantee Building and Loan Association owned a theater which it desired to sell. Kamm, a broker, aware that the theater was for sale and that his prospect, Levin, a theater operator, might buy it, disclosed the name of the customer to Flink, the president of the association. Flink disclosed Levin's name to his brother, who was also a broker. The sale to Levin was consummated without Kamm's participation, and a commission paid to Flink's brother. Reversing a dismissal of Kamm's complaint at the pleading stage, Justice Heher wrote:
 
 
 21
 If the challenged action were taken for the indirect purpose of doing injury to appellant, or of benefiting respondents at the former's expense, it is a wrongful act, unless done in the exercise of an equal or superior right, and therefore a malicious act, and actionable. But the case made by appellant clearly negatives the existence of an equal or superior right. The identity of its customer was disclosed, under the seal of confidence, for the legitimate use of the loan association only, and an obligation was thereby imposed upon Flink not to make an unfair use of the information thus given. Appellant had a property interest therein which the law will protect against unjust use by one who has gained it by virtue of a confidential relation. And this obligation may, in certain circumstances, be implied.... Where the duty is imposed, either expressly or by implication, its breach is tortious, and therefore actionable.
 
 
 22
 Id. at 588-89, 175 A. at 67 (citations omitted). Kamm v. Flink is significant in two respects. First, it reiterates the rule that the relationship interfered with need not be an enforceable contract, but only must be such that there is a reasonable expectation that a contract would have been entered into but for the interference. Id. at 590, 175 A. at 68. Second, it recognizes that no prior relationship need exist between the victim and the tortfeasor, and that no express undertaking of confidentiality is required.[1] Id. at 590, 175 A. at 67. The duty of confidentiality may arise by implication from the circumstances in which disclosure is made to the wrongdoer. Id.
 
 
 23
 The circumstances held in Kamm v. Flink to give rise to a cause of action for wrongful interference are largely replicated in the record before us. Just as Kamm had no prior relationship with the Association or Flink and no contract with Levin, Zippertubing had no prior relationship with Teleflex and no contract with Nab. While the facts in Kamm v. Flink itself dealt with an express assurance of confidentiality, Justice Heher, writing for a unanimous court, left no doubt that the circumstances surrounding a transaction can give rise to an implied duty of confidentiality. Id. The circumstances providing the basis for the relationship between Zippertubing/Surf and Teleflex as it had developed by the time of the meeting of February 11 is an example of what the Kamm court meant. The jury could have found that all participants were aware that Zippertubing's business was to design, procure extrusion of, and resell closeable insulators; that Teleflex issued to Surf a quotation, "firm for 30 days," for the extrusions: that when the quotation was issued Teleflex was not in the business of manufacturing and selling closeable insulators; that Teleflex did not know Zippertubing's customer, but did know that Zippertubing had a customer; that Zippertubing maintained the identity of that customer in confidence until satisfied that Teleflex was ready and willing to go forward with the extrusions at the price indicated in the quotation; that the only purpose of the disclosure was to facilitate the inspection of facilities requested by the purchaser. The New Jersey courts would hold, we confidently predict, that Teleflex received the name of Nab under an implied duty of confidentiality.
 
 
 24
 Teleflex urges that the tort recognized in Kamm v. Flink is confined to the real estate brokerage context. While the tort has received widespread recognition in that context,[2] it has historically been applied, as noted above, in other contexts. New Jersey continues to impose liability for interference with forms of prospective advantage other than brokerage commissions. E.g. Zelenka v. Benevolent and Protective Order of Elks, 129 N.J.Super. 379, 324 A.2d 35 (App.Div.1974) (interference with membership in a fraternal order); Association Group Life, Inc. v. Catholic War Veterans, 120 N.J.Super. 85, 293 A.2d 408 (App.Div.1971) (Conford, J.) (interference with expectancy of commissions on insurance policy renewals); Mayflower Industries v. Thor Corp., 15 N.J.Super. 139, 83 A.2d 246; 15 N.J.Super. 337, 83 A.2d 366 (Ch.Div.1951) (Francis, J.), aff'd, o.b., 9 N.J. 605, 89 A.2d 242 (1952) (interference with proposed distributorship agreement by threats of groundless litigation); Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J.Super. 244, 128 A.2d 281 (App.Div.1957) (fee requirements imposed by cemetery constituted interference with business of independent monument sellers); Newark Hardware & Plumbing Supply Co. v. Stove Mfrs. Corp., 136 N.J.L. 401, 56 A.2d 605 (Sup.Ct.), aff'd 137 N.J.L. 612, 61 A.2d 240 (1948) (accepting misdelivery of a consignment intended for a competitor an interference with competitor's business). We therefore are convinced that New Jersey has not in the past, and would not in the future restrict the boundaries of this tort to a real estate context. However, even if the New Jersey Supreme Court in the future would desire limiting the expansion of this cause of action, we do not doubt that it would apply the Kamm v. Flink rule in circumstances such as those disclosed in the present record where Zippertubing's role as a subcontractor, designing and procuring the manufacture of closeable insulators is factually analogous to the role of a broker in facilitating real estate transactions.
 
 
 25
 Teleflex also urges that the evidence of a prospective advantage was insufficient to go to the jury. We disagree. From the testimony the jury could have found that Nab would have contracted with Zippertubing if it was satisfied that Zippertubing had an extruder with sufficient production capacity available. It could have inferred from the quotation issued by Teleflex to Surf, and Teleflex's subsequent delivery of extrusions to Nab, that until Teleflex's tortious conduct, the plaintiffs had a reasonable expectation that such an extruder was available. As noted in Part II B, infra, this was the factual theory on which the case was submitted to the jury. Certainty of economic advantage need not be shown; reasonable probability of that advantage, absent interference, suffices. Myers v. Arcadio, Inc., 73 N.J.Super. 493, 180 A.2d 329 (App.Div.1962).
 
 B. The Adequacy of the Court's Charge
 
 26
 In submitting the case to the jury the trial court gave a lengthy instruction on the elements of the tort of interference with a prospective advantage. Carefully and repeatedly the court instructed that if Teleflex and the plaintiffs were competitors, both seeking to obtain Nab as a customer, absent a contract, "there would be no prohibition against Teleflex getting to Nab first." App. 2625. The court charged:
 
 
 27
 Now, in order for the plaintiff to recover damages for unlawful interference with prospective economic advantage, it must be found that the defendant interfered with a reasonable expectancy of economic advantage and benefit on the part of the plaintiff.
 
 
 28
 Thus, the plaintiff must prove the following elements: First, the existence of a reasonable expectation of economic advantage or benefit belonging to it; Second, that the defendant had knowledge of that expectation of economic advantage; Third, that the defendant wrongfully and without justification interfered with the plaintiff's reasonable expectation of economic advantage or benefits; Fourth, that in the absence of the wrongful act of the defendant, it is reasonably probable that the plaintiff would have realized its economic advantage or benefit; And fifth, that the plaintiff sustained damages as a result of this activity.
 
 
 29
 App. 2626-27. Teleflex does not contend that the foregoing misstates the elements of the tort under New Jersey law. The court enlarged on each element separately.
 
 
 30
 On the first element, reasonable expectation of economic benefit, the jury was instructed:
 
 
 31
 Now, the plaintiffs contend here that at the time of Teleflex's allegedly wrongful conduct there existed an expectancy that Teleflex, Surf and Zippertubing would all be involved in the sale of insulation to the Nab Construction Company. You must determine, first, whether there existed such an expectancy. In other words, it is Zippertubing's position that they had come to a meeting of the minds or so close thereto as to be virtually the same thing with the Nab Construction Company and that this was their economic expectancy. They do not contend that they actually had a contract.
 
 
 32
 ....
 
 
 33
 Now, Teleflex, on the other hand, contends that while Nab and Zippertubing had discussions, they never reached a point where the prospect of a contract between the two of them was so close that there was such a reasonable expectancy, and, therefore, nothing for Teleflex to deprive Zippertubing of. That is an issue of fact and only you can determine it.
 
 
 34
 You must determine whether or not, as a result of their negotiations with Nab, the plaintiff in this case had a reasonable expectancy of a contract with Nab. If they did, then you should find that there was a reasonable expectancy. If not, then not, and that's the end of this case.
 
 
 35
 App. 2627-29. After calling the jury's attention to the testimony that the last impediment to a contract between Zippertubing and Nab was Nab's desire to make an inspection, the court then related Teleflex's contention that it never led Zippertubing and Surf to believe that it would be part of the deal as envisioned by Zippertubing and Surf. The court charged:
 
 
 36
 [Teleflex argues] they never led Zippertubing and Surf to believe they would be part of any deal and regarded them at all times not as co-venturers in respect to Nab, but as competitors. If you find that the plaintiff has not proven that this is not true, then your verdict should obviously be for the defendant, as I told you.
 
 
 37
 App. 2631. Teleflex objected that in the charge the court "said nothing at all about the obligation of the plaintiffs to establish that they would have had a product in order to be able to make a delivery in order to be able to achieve an economic benefit...." App. 2639. The court responded:
 
 
 38
 What I said to them was something much more important. I said to them they would have to find that you people, Teleflex, gave Zippertubing to understand that you would supply the product.... Of course, if they do prove that, then they proved everything that you have suggested, right? Because they would have had that supplier.
 
 
 39
 Id. We hold that the court's charge on reasonable expectation of economic benefit gave Teleflex all it was entitled to and perhaps more.
 
 
 40
 On the third element, wrongful interference without justification, the jury was instructed:
 
 
 41
 [The plaintiffs] contend they went to Teleflex to arrange for the quotation of prices looking towards the signing of a contract which would ultimately involve Teleflex, Zippertubing, Surf and Nab. They contend that because Teleflex led them to believe that they would, in fact, enter into the deal, Zippertubing gave to Teleflex information which Teleflex would not otherwise have been given; namely, the name of the ultimate contractor here, Nab.
 
 
 42
 App. 2629-30. Teleflex objected. "Well, the problem that I had and that I thought your Honor touched on, the subject of a confidential relationship but did not amplify it in any way." App. 2639. The court responded:
 
 
 43
 I said something more important. I said they would have to prove that the only reason they gave you the name of the customer was because you had assured them that you would, in fact, do this job with them. If they prove that, then I think they have proven the case.
 
 
 44
 App. 2639-40. As with the charge on expectation of an economic benefit, we hold that the charge on wrongful conduct, by misuse of information received in confidence, gave Teleflex all it was entitled to under New Jersey law. Teleflex contends on appeal that the charge should have been to the effect that the information disclosed "must be secret and not publicly available." Appellant's brief at 35. No such objection was made to the charge in the district court. See Fed.R.Civ.P. 51. Moreover under New Jersey law, liability for interference with a prospective advantage may be imposed on the basis of information, confidential as between the parties, but otherwise available to the public. Kamm v. Flink, supra. Thus, even if the point had been preserved, the court should not have charged that plaintiffs had to establish the equivalent of a trade secret.C. Disgorgement of Profits
 
 
 45
 The plaintiffs presented evidence from which the jury could reasonably have inferred that Zippertubing and Surf lost anticipated profits. They did not attempt, however, to establish the amount of their lost profits. Instead they proved the amount of profits made by Teleflex as a result of its wrongdoing.
 
 
 46
 Teleflex urges that even assuming a jury question and a proper charge on liability, it is entitled to a judgment notwithstanding the verdict because the plaintiffs' evidence on damages was presented on a theory which New Jersey would not countenance.
 
 
 47
 It is undoubtedly so that in most instances in which a New Jersey plaintiff has established liability for interference with a prospective advantage the judgment has been for the plaintiff's lost profits. Probably that is because in most instances the amount of plaintiff's loss and defendant's gain is the same. In the one case dealing with the question in New Jersey, however, the Court of Errors and Appeals held that an accounting for profits is an appropriate remedy for interference with a prospective advantage. Schechter v. Friedman, 141 N.J.Eq. 318, 57 A.2d 251 (1948). That holding is consistent with the New Jersey law respecting the analogous business tort of misappropriation of a business name, L. Martin Co. v. L. Martin & Wilckes Co., 75 N.J.Eq. 257, 72 A. 294 (1909), and that of misuse of trade secrets. A. Hollander & Son, Inc. v. Imperial Fur Blending, 2 N.J. 235, 66 A.2d 319 (1949). Teleflex points out that these accounting for profits cases were suits in equity, and urges that such a remedy is unavailable in an action at law. That simply is not the case. In a diversity suit the distinction between cases at law or in equity is significant only with regard to the respective roles of judge and jury. Fed.R.Civ.P. 1; Goodman v. Mead Johnson & Co., 534 F.2d 566 (3d Cir.1976). The equitable or legal nature of the relief does not relieve the federal forum of the obligation to afford the same relief which a state court would afford with respect to state law claims. Guaranty Trust Co. v. York, 326 U.S. 99, 105, 65 S.Ct. 1464, 1467, 89 L.Ed. 2079 (1945). Moreover the plaintiff in Schechter v. Friedman, supra, proceeded in equity because he sought injunctive relief as well as money damages. No New Jersey case has been called to our attention suggesting that if the victim of a tort who has suffered actual damages cannot or does not elect to seek injunctive relief he may not seek an accounting for profits. Certainly Red Devil Tools v. Tip Top Brush Co., Inc., 92 N.J.Super. 570, 224 A.2d 336 (App.Div.1966) modified, 50 N.J. 563, 236A.2d 861 (1967), on which Teleflex relies is not such a case. In Red Devil the owner of a common law trademark, who neither made nor sold paint brushes, successfully enjoined the use of the trademark for paint brushes. An accounting for profits was denied, not because profits of a tortfeasor cannot be recovered at law, but because the trademark owner, not in the brush business, lost no prospective business advantage of its own. Here, plainly, the plaintiffs lost a prospective advantage.
 
 
 48
 The remedy applied in Schechter v. Friedman, supra, is consistent with constructive trust principles, and "it is possible to think of the accounting for profits in this kind of case as simply a special form of constructive trust." D. Dobbs, Remedies 253 (1973). The constructive trust is, of course a familiar remedy in the New Jersey courts. Clark v. Judge, 84 N.J.Super. 35, 200 A.2d 801 (Ch.Div.1964), aff'd o.b., 44 N.J. 550, 210 A.2d 415 (1965); D'Ippolito v. Castoro 51 N.J. 584, 242 A.2d 617 (1968). The Schechter v. Friedman remedy is, moreover consistent with the election of remedies available in New Jersey to the victim of a conversion of personal property. Kaplan v. Cavicchia, 107 N.J.Super. 201, 257 A.2d 739 (App.Div.1969). All of these closely related damage rules are consistent with the policy of discouraging tortious conduct by depriving the tortfeasor of the opportunity to profit from wrongdoing. Consistent with that policy, the trial court properly permitted the plaintiffs to prove as damages the amount of Teleflex's profits. The court charged:The law says that when one has unlawfully deprived another of a contract or a business opportunity and has made that opportunity his own, he is not to be permitted to retain any of the profits, any of the benefits of his unlawful conduct.
 
 
 49
 Therefore, if you were to find that the plaintiff has met its burden of proof as I have defined it to you on each and every one of the elements of the case, it would be your job to award such damages as would deprive the defendant of any unlawful benefit of its unlawful conduct.
 
 
 50
 App. 2633. This charge was correct, and the jury's verdict, consistent with it, must stand.
 
 D. Calculation of Profits
 
 51
 (1) Overhead
 
 
 52
 As to the calculation of profits which might be recovered the court charged:
 
 
 53
 In determining the amount of Teleflex's profits, I instruct you that profits equal the total amount of money that Teleflex earned as a result of the Nab contract, less any direct expenses that were incurred with respect to this particular conduct [contract]. Thus, any direct costs of this project should be subtracted from Teleflex's gross receipts in computing Teleflex's profits.
 
 
 54
 * * *
 
 
 55
 You should not deduct from their gross receipts any expenses of running the business which they would have had anyway.
 
 
 56
 App. 2634, 2636. Teleflex objects that this charge precluded the jury from deducting its indirect costs in calculating its profits. The rule which the trial court charged is that generally applied in New Jersey in actions seeking lost profits for breach of contract. Applying New Jersey law in such a case Judge Seitz observed:
 
 
 57
 We agree with the view that where the plaintiff's overhead or fixed expenses are not affected by the defendant's breach, no deduction should be made in calculating the profits which the plaintiff would have made had it not been for the breach. It is obvious that fixed expenses are an essential element in determining the net profits of any business and must, for accounting purposes, be allocated among each of the businesses' sales activities. Nevertheless, as we stated in Vitex Manufacturing Corp. v. Caribtex Corp., 377 F.2d 795 (3d Cir.1967), it does not follow that a proportionate share of fixed expenses should be considered a cost factor in the computation of lost profits:
 
 
 58
 "The point is that while these items all are paid from the proceeds of the business, they do not necessarily bear such a direct relationship to any individual transaction to be considered a cost in ascertaining lost profits." 377 F.2d at 799.
 
 
 59
 Furthermore, it is apparent that the fixed expenses of a business must be paid from the profits remaining after all direct costs have been paid. Unless damages restore the latter amount to plaintiff, it will not be fully compensated for the breach.
 
 
 60
 Buono Sales, Inc. v. Chrysler Motors Corporation, 449 F.2d 715, 719-20 (3d Cir.1971). No authority has been cited to us casting any doubt upon the accuracy of this prediction as to the rule a New Jersey court would apply. We hold that the same rule should be applied when a wrongdoer is asked to disgorge profits. The wrongdoer should not be permitted, by misappropriating another's opportunity, to use that opportunity in order to help absorb fixed expenses of its own business.
 
 
 61
 (2) Profits on Other Products
 
 
 62
 Teleflex points out that its negotiations with Zippertubing involved extrusion of five specific diameters of closeable insulation. It later contracted with Nab not only to supply closeable insulation, but also to furnish some seamless insulation, and tie-wraps for the closeable insulation. Teleflex urges that the profits derived from the sale of these products should not have been included in the damage award. The measure of damages in tort cases includes those reasonably foreseeable at the time of the commission of the tortious act or omission. It was certainly reasonably foreseeable that in procuring insulation Nab would elect to deal with a single source of supply, and that, but for the tort, that source would have been Zippertubing. The jury could have so concluded based on inferences drawn from Simpson's testimony regarding Nab's customary practices in dealing with contractors, App. 1432, and from evidence that Nab did, in fact, purchase the seamless insulation and tie-wraps from its closeable insulation supplier. Thus, it was not error to permit the jury to base its award on the entire Teleflex-Nab transaction.
 
 
 63
 (3) Deduction of Profits Which Would Have Been Earned Under
 
 
 64
 the Terms of Teleflex's Original Quotation
 
 
 65
 On appeal, Teleflex urges that at the very least the damage award should have been reduced by the amount of profit to which it would have been entitled had the Zippertubing-Surf-Teleflex transaction gone forward. We do not consider this contention, because we have been unable to find any place where it was presented to the trial court prior to the time the jury retired. Thus, it cannot be relied on as a ground for setting aside the verdict. Fed.R.Civ.P. 46, 51.
 
 E. Punitive Damages
 
 66
 Teleflex next contends on appeal that the court erred in submitting the plaintiffs' claim for punitive damages to the jury. Teleflex points out that it has been punished as a wrongdoer by being forced to disgorge its profits, and that the award of punitive damages is duplicative and an excessive punishment. The problem with this argument, of course, is that it is equally applicable to any case in which both compensatory and punitive damages may be awarded. It is conceivable, for example, that a business-tort plaintiff seeking its own lost profits rather than those gained by the wrongdoer, might prove and recover more than the wrongdoer gained from the transaction. Such a defendant would undoubtedly also feel "doubly punished" if assessed with punitive damages. The fact that a disgorgement of profits or unjust enrichment measure was applied with respect to compensatory damages cannot be dispositive. See D. Dobbs, Remedies, 224 (1973).
 
 
 67
 Teleflex also urges that the plaintiffs' evidence was insufficient under New Jersey law to permit the punitive damage claim to go to the jury. Under that law a tortfeasor may be assessed punitive damages if there is evidence from which the factfinder may infer "actual malice, which is nothing more or less than intentional wrongdoing--an evil-minded act ... or an act accompanied by a wanton and willful disregard of the rights of another." Sandler v. Lawn-A-Mat Chemical & Equipment Corp., 141 N.J.Super. 437, 448, 358 A.2d 805, 811 (App.Div.), cert. denied, 71 N.J. 503, 366 A.2d 658 (1976). "Something more than the mere commission of the tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice.' " Grillo v. Board of Realtors, 91 N.J.Super. 202, 232, 219 A.2d 635, 652 (Ch.Div.1966). "A plaintiff whose claim to punitive damages rests upon a wrongful motive of defendant, not inherent in the offence which fixes his legal liability, must present some proof from which such wrongful motive may be legally inferred." Haines v. Schultz, 50 N.J.L. 481, 485, 14 A. 488, 489-90 (Sup.Ct.1888). See, Nappe v. Anschelewitz, 97 N.J. 37, 477 A.2d 1224 (1984).
 
 The trial court instructed the jury:
 
 68
 You may award [punitive] damages if you determine that the defendant's act or acts were actuated by actual malice, which is nothing less than the intentional wrongdoing, an evil minded act, or an act accompanied by a wanton and wilful disregard of the rights of another.
 
 
 69
 App. 2637. Teleflex did not object to this instruction, and does not urge here that it misstates the elements necessary under New Jersey law for the award of punitive damages.
 
 
 70
 We have held in Part II A above that the circumstances surrounding the transactions between the parties provided sufficient evidence to permit a jury to find that a relationship of confidentiality arose, and that Teleflex breached its resulting duty by using the identity of Zippertubing's customer, Nab, in contravention of Zippertubing/Surf's prospective advantage. We need not decide whether, from the very nature of the tort, its elements would in any event support punitive damages, since there was ample additional evidence in this case from which malice could be inferred. The jury could find that Coneys and Perrera, with full knowledge that the customer name had been disclosed in confidence, undertook what they knew to be an improper breach of the resulting duty. Knowledge of impropriety could be inferred from the evidence that they instructed Hardiman to give Zippertubing and Surf false information about the February 12 inspection being "off," while concealing even from Hardiman the fact that they were meeting with Simpson at the scheduled time. Moreover, malice could be inferred from the evidence that Coneys lied to Simpson in his initial phone call when he suggested that Teleflex and Zippertubing were competitors, and that the Zippertubing and Surf representatives had arrived at the Teleflex plant unannounced. Finally, the evidence of Hardiman's evasiveness at the 4:00 p.m. meeting on February 12 would support an inference that after the approach was made to Nab, steps were taken to prevent Zippertubing from learning that Teleflex was hard at work stealing its customer, so as to discourage actions by Zippertubing which might have salvaged its prospective advantage. With such evidence in the record we cannot hold that the trial court should not have submitted the issue of malice to the jury.
 
 F. Prejudgment Interest
 
 71
 As noted above, the trial court increased the judgment by $345,862.96, which represented interest on the $2,000,000 verdict for disgorged profits, calculated from the date of the last payment made by Nab to Teleflex. The plaintiffs waived any claim for interest on profits realized prior to that date. Teleflex contends that this award was an abuse of discretion.
 
 
 72
 The law of the forum state controls. Jarvis v. Johnson, 668 F.2d 740, 746 (3d Cir.1982). New Jersey Court Rule 4:42-11(b) provides in relevant part:
 
 
 73
 [T]he court shall, in tort actions, including products liability actions, include in the judgment simple interest at 12% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest.
 
 
 74
 Teleflex relies on the proviso to the rule, giving the court discretion to withhold otherwise mandatory interest in "exceptional cases." It does not contend that the tort of interference with a prospective advantage falls outside the rule. The only "exceptional circumstance" in this case to which it points is plaintiffs' receipt of disgorged profits, which exceed the amount they would have realized had the tort not been committed. The trial court rejected this as an "exceptional circumstance," observing:
 
 
 75
 This is not exceptional. To permit Teleflex to keep not only the profits which the jury found it had stolen as a result of its misconduct to the plaintiff, to permit them to keep the use of that money would be to permit them a profit. For if, in the end, all they need do is disgorge what it is they gained by their unlawful misconduct without regard to the fact they have had the use of that money for months and years, would be to permit to the defendant an economic advantage from their own misconduct.
 
 
 76
 App. 3331. Prejudgment interest was calculated only for the period following completion of the contract, during which Teleflex had and retained the profits the contract produced. Thus no duplication of recovery occurred. In this instance Teleflex went forward with the Nab transaction, not only after being put on notice by a lawyer's letter of the Zippertubing/Surf claim, but even after the instant suit was commenced. It had use of the profits while it continued to resist payment by defending the suit vigorously. Clearly the court's ruling was not an abuse of discretion. It was entirely consistent with the purposes motivating the New Jersey Supreme Court to adopt Rule 4:42-11(b). See Busik v. Levine, 63 N.J. 351, 307 A.2d 571, appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).
 
 G. Alleged Trial Errors
 
 77
 (1) The Court's Questioning of Witnesses
 
 
 78
 In its motion for a new trial, Teleflex argued that the court committed error by examining certain witnesses during the course of the trial. No objection was made at any time prior to the commencement of the jury's deliberations. Thus, the matter may not ordinarily be considered now. Fed.R.Evid. 614(c). Nevertheless, we have reviewed the portions of the trial transcript containing the instances of interrogation relied on in order to determine whether a plain error standard should apply. Fed.R.Evid. 103(d). Our reading of the record convinces us that far from being plain error, the court's interrogation was well within the bounds of examination permitted by the governing case law. E.g., United States v. Green, 544 F.2d 138 (3d Cir.1976), cert. denied, 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977).
 
 
 79
 (2) The Court's Evidentiary Rulings
 
 
 80
 Teleflex moved in limine to prevent the plaintiffs from offering evidence on subjects characterized by the plaintiffs as four "theories" which underlie the tort of interference with a prospective advantage. Teleflex contends that the court's denial of this motion permitted the plaintiffs to prejudicially introduce evidence beyond the elements of the tort of interference with a prospective advantage. We disagree. An examination of the "theories" offered by Zippertubing/Surf discloses that despite their being called "theories," they are merely a general discussion of the tort of interference with a prospective advantage. Indeed, the same body of case law is common to the entire discussion. To prohibit evidence on the matters covered by the "theories" would prevent the plaintiffs from proving their case. There was no error.
 
 
 81
 Next, Teleflex contends that the court erred in granting the plaintiffs' motion to prevent Teleflex from introducing evidence on the issue of whether the New York City Transit Authority would have insisted on a particular type of closure device. The court properly ruled that allowing evidence on this point would require the jury to engage in speculation about a matter too far afield from the elements of plaintiffs' case. The court's ruling was well within the discretion afforded by Fed.R.Evid. 403.
 
 
 82
 Similarly, we find no abuse of discretion in the court's limiting the scope of Teleflex's cross-examination of Zippertubing's witness, Bruce Hoffine. Id.
 
 II.
 Conclusion
 
 83
 The court did not err in denying Teleflex's motion for judgment notwithstanding the verdict, with respect either to disgorgement of profits or to punitive damages. The court did not err in denying Teleflex's motion to amend the judgment to exclude prejudgment interest. The court did not err in denying Teleflex's new trial motion. The judgment will therefore be affirmed in all respects.
 
 
 
 [1]
 It is clear, of course, that a duty of confidentiality may arise out of an existing relationship, and that inducing the breach of such a duty results in a constructive trust. Vulcan Detinning Co. v. American Co., 72 N.J.Eq. 387, 67 A. 339 (1907)
 
 
 [2]
 E.g., Harris v. Perl, 41 N.J. 455, 197 A.2d 359 (1964); Louis Schlesinger Co. v. Wilson, 22 N.J. 576, 127 A.2d 13 (1956); Louis Schlesinger Co. v. Rice, 4 N.J. 169, 72 A.2d 197 (1950); Leslie Blau Co. v. Alfieri, 157 N.J.Super. 173, 384 A.2d 859 (App.Div.1978)